**WAL–MART STORES, INC.,**
**et al., Petitioners,**

v.

**Harry W. STURGES, III,**
**et al., Respondents.**

No. 98–1107.

Supreme Court of Texas.

Argued Jan. 19, 2000.

Decided March 8, 2001.

Rehearing Overruled Sept. 20, 2001.

Kevin D. Jewell, J. Preston Wrotenbery, Magenheim Bateman Robinson Wrotenbery & Helfand, P.L.L.C., Houston, for Petitioner.

Carl A. Parker, Parker & Parks, Port Arthur, Morris C. Gore, Dallas, for Respondent.

Justice HECHT delivered the opinion of the Court, in which Chief Justice PHILLIPS, Justice ENOCH, Justice OWEN, and Justice ABBOTT joined, and in Parts I, IV and V of which Justice HANKINSON and Justice O'NEILL joined.

Texas, like most states, has long recognized a tort cause of action for interference

with a prospective contractual or business relation even though the core concept of liability—what conduct is prohibited—has never been clearly defined. Texas courts have variously stated that a defendant may be liable for conduct that is "wrongful", "malicious", "improper", of "no useful purpose", "below the behavior of fair men similarly situated", or done "with the purpose of harming the plaintiff", but not for conduct that is "competitive", "privileged", or "justified", even if intended to harm the plaintiff. Repetition of these abstractions in the case law has not imbued them with content or made them more useful, and tensions among them, which exist not only in Texas law but American law generally, have for decades been the subject of considerable critical commentary.

■ This case affords us the opportunity to bring a measure of clarity to this body of law. From the history of the tort in Texas and elsewhere, and from the scholarly efforts to analyze its boundaries, we conclude that to establish liability for interference with a prospective contractual or business relation the plaintiff must prove that it was harmed by the defendant's conduct that was either independently tortious or unlawful. By "independently tortious" we mean conduct that would violate some other recognized tort duty. We must explain this at greater length, but by way of example, a defendant who threatened a customer with bodily harm if he did business with the plaintiff would be liable for interference because his conduct toward the customer—assault—was independently tortious, while a defendant who competed legally for the customer's business would not be liable for interference. Thus defined, an action for interference with a prospective contractual or business relation provides a remedy for injurious conduct that other tort actions

might not reach (in the example above, the plaintiff could not sue for assault), but only for conduct that is already recognized to be wrongful under the common law or by statute.

Because the defendant's conduct in this case was not independently tortious or unlawful, and because the defendant did not breach its contract, we reverse the court of appeals' judgment[1] and render judgment for the defendant.

**I**

Plaintiff Harry W. Sturges, III contracted for himself and plaintiffs Dick Ford, Bruce Whitehead, and J.D. Martin, III to purchase from Bank One, Texas a vacant parcel of commercial property in Nederland, Texas, referred to as Tract 2. The contract, dated December 29, 1989, gave purchasers the right to terminate if within sixty days they were unable to lease the property and "to secure the written approval of Wal–Mart Corporation to the intended use of the Property, in accordance with the right so given to Wal–Mart pursuant to certain restrictions on the Property." The right referred to was the right to approve modifications in a site plan for the property that Wal–Mart Stores, Inc. and Wal–Mart Properties, Inc. (collectively, "Wal–Mart") held under two recorded instruments, each entitled "Easements with Covenants and Restrictions Affecting Land" ("ECRs"), one filed in 1982 and the other in 1988. The purpose of the ECRs was to assure the commercial development of Tract 2 and an adjacent tract, Tract 1, according to a prescribed plan.

The 1982 ECR was between Wal–Mart, which owned Tract 2 at the time, and the State Teachers Retirement System of Ohio ("OTR"), which owned Tract 1, having ac-

---

1. 39 S.W.3d 608 (Tex.App.—Beaumont 1998).

quired it from Wal–Mart under a sale and leaseback agreement. OTR leased Tract 1 to Wal–Mart to use for a store. In 1984, Wal–Mart sold Tract 2 to a joint venture that included a partnership, Gulf Coast Investment Group. Gulf Coast later acquired Tract 2 from the joint venture. The 1988 ECR, made by Gulf Coast, OTR, and Wal–Mart, modified the site plan for the tracts and otherwise incorporated the terms of the 1982 ECR.

Gulf Coast's efforts to develop Tract 2 failed, and in 1989 Bank One acquired the property by foreclosure. Two of Gulf Coast's partners, plaintiffs Whitehead and Martin, along with two other investors, plaintiffs Sturges and Ford, continued to look for a way to develop the property. When Sturges learned that Fleming Foods of Texas, Inc. was interested in building a food store in the area, he contracted with Bank One to purchase Tract 2 for the plaintiffs in hopes of leasing the property to Fleming Foods.

As soon as the agreement with Bank One was executed, Sturges contacted Wal–Mart to request a modification of the 1982/1988 ECRs to permit construction on Tract 2 of a food store to Fleming's specifications. A modification was necessary in part because Fleming wanted to construct a 51,000 square foot store, and the site plan permitted only a 36,000 square foot structure. A manager in Wal–Mart's property management department, DeLee Wood, told Sturges to submit a revised site plan, and though she did not have authority to approve the modification herself, she indicated to Sturges that Wal–Mart would approve it. About the same time, Sturges obtained from Fleming a non-binding memorandum of understanding that it would lease Tract 2.

Unbeknownst to Wood, a manager in another Wal–Mart department, Sandra Watson, had been evaluating the possibili-

ties for expanding stores at various locations, including the Nederland store. If a store could not be expanded, Watson's assignment was to consider relocating the store. In July 1989 Watson hired a realtor, Tom Hudson, to help Wal–Mart acquire Tract 2 for purposes of expansion. When Hudson learned of Sturges's contract with Bank One, he suggested to Watson that Wal–Mart could thwart Sturges's efforts to purchase the property by refusing to approve the requested modification of the 1982/1988 ECRs. At the time, neither Watson nor Hudson knew of Wood's conversations with Sturges.

When Wood's and Watson's conflicting activities came to the attention of the head of Wal–Mart's property management department, Tony Fuller, he agreed with Watson that Wal–Mart should try to acquire Tract 2 and told Wood to deny Sturges's request to modify the ECR, which she did in a letter to Sturges without explanation. Fuller then instructed Hudson to contact Fleming and communicate Wal–Mart's desire to expand onto Tract 2. Hudson complied, telling L.G. Callaway, Fleming's manager of store development who had been working on the deal with Sturges, that if Wal–Mart could not acquire Tract 2, it would close its store on Tract 1 and relocate. Since Fleming was not interested in Tract 2 without a Wal–Mart store next door, Callaway took Hudson's call to be an ultimatum not to move forward on the proposed lease with Sturges. Consequently, Fleming canceled its letter of intent with Sturges, and the plaintiffs opted out of their contract with Bank One. Several months later, Wal–Mart purchased Tract 2 and expanded its store.

The plaintiffs sued Wal–Mart for tortiously interfering with their prospective lease with Fleming and for breaching the 1982/1988 ECRs by unreasonably refusing to approve the requested site plan modifi-

cation. The plaintiffs' actual damages claim under both theories was the same-the profits the plaintiffs would have made on the Fleming lease. The jury found Wal–Mart liable on both theories. Concerning the plaintiffs' interference claim, the district court submitted to the jury two questions with accompanying instructions as follows:

> Did Wal–Mart wrongfully interfere with Plaintiffs' prospective contractual agreement to lease the property to Fleming?
>
> > Wrongful interference occurred if (a) there was a reasonable probability that Plaintiffs would have entered into the contractual relation, and (b) Wal–Mart intentionally prevented the contractual relation from occurring with the purpose of harming Plaintiffs.
>
> Was Wal–Mart's intentional interference with Plaintiffs' prospective lease agreement with Fleming justified?
>
> > An interference is "justified" if a party possesses an interest in the subject matter equal or superior to that of the other party, or if it results from the good faith exercise of a party's rights, or the good faith exercise of a party's mistaken belief of its rights.

The jury answered "yes" to the first question and "no" to the second. Wal–Mart offered no objection to this part of the jury charge that is relevant to our consideration of the case. The jury assessed $1 million actual damages on the contract claim and on the interference claim, assessed $500,000 punitive damages on the interference claim, and found that reasonable at-torney fees for each side were $145,000. At the plaintiffs' election, the trial court rendered judgment on the interference claim, awarding actual and punitive damages but not attorney fees.

All parties appealed. The court of appeals affirmed the award of actual damages but remanded for a retrial of punitive damages, holding that the trial court had improperly excluded evidence offered by the plaintiffs during the punitive damages phase of the trial.[2]

We granted Wal–Mart's petition for review.[3]

## II

Wal–Mart argues that there is no evidence to support the jury's verdict that it wrongfully interfered with the plaintiffs' prospective lease with Fleming or that it was not justified in acting as it did. Our analysis of these arguments is complicated because it must be made in light of the jury charge that the district court gave without objection,[4] even though, as we conclude, the charge's statement of the law was not entirely correct.[5] We will focus on Wal–Mart's argument that there is no evidence of wrongful interference: that is, in the language of the jury charge, no evidence that Wal–Mart acted "with the purpose of harming Plaintiffs." To resolve this issue, we must understand what kind of conduct is legally harmful and constitutes tortious interference. Whenever two competitors vie for the same business advantage, as Wal–Mart and Sturges did over the acquisition of Tract 2, one's suc-

**2.** *Id.*

**3.** 39 S.W.3d 608, 43 Tex. Sup.Ct. J. 94 (1999).

**4.** *See City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 71 (Tex.2000) (stating that when no objection was made to a jury instruction, evidence to support a finding based on the instruction should be assessed "in light of" the instruc-tion given); *Larson v. Cook Consultants, Inc.*, 690 S.W.2d 567, 568 (Tex.1985) (same).

**5.** *See also Diamond Shamrock Ref. & Mktg. Co. v. Mendez*, 844 S.W.2d 198, 200 (Tex. 1992) (analyzing the proof of a false light invasion of privacy even though the Court had not recognized such a tort).

cess over the other can almost always be said to harm the other. Wal–Mart's evidentiary challenge here raises the question of what harm must be proved to constitute tortious interference. To answer this question, we look to the historical development of the interference torts in other jurisdictions and in Texas and survey every Texas case involving a claim of intentional interference with prospective relations. We then analyze the evidence in this case.

## A

The origins of civil liability for interference have been traced to Roman law that permitted a man to sue for violence done to members of his household.[6] The common law also recognized such liability as early as the fourteenth century and extended it to include driving away a business's customers or a church's donors.[7] But a common-law cause of action was strictly limited to cases in which actual violence or other such improper means were used.[8] For centuries the common law continued to allow civil actions for interference with one's customers or other prospective business relationships, but as the *Restatement (Second) of Torts* summarizes, "in all of them the actor's conduct was characterized by violence, fraud or defamation, and was tortious in character."[9]

The common law departed from this requirement in 1853 in the English case of *Lumley v. Gye*,[10] which held that liability could be imposed for interference with a contract if the defendant acted "wrongfully and maliciously", even if the defendant's conduct was not tortious or illegal.[11] In that case, Gye induced an opera singer to sing for him instead of Lumley, for whom she had contracted to perform, not with threats of violence but by offering her a higher fee.[12] Forty years later in *Temperton v. Russell*,[13] the English court reaffirmed its decision in *Lumley*, holding that trade union officials could be liable to a building materials supplier for threatening his customers with labor disturbances if they continued to purchase supplies from him.[14] The court announced that the rule in *Lumley* would apply not only to interference with all contracts, regardless of the subject matter,[15] but to interference with prospective or potential relations as well.[16]

*Temperton*'s treatment of interference with prospective relations as simply another aspect of interference with contract was a mistake. It is one thing for *A* and *B* to compete for *C*'s business, and quite anoth-

---

**6.** *See* W. Page Keeton et al., Prosser & Keeton on the Law of Torts § 129, at 979–980 (5th ed.1984); Francis Bowes Sayre, *Inducing Breach of Contract*, 36 Harv. L.Rev. 663, 663–664 (1923).

**7.** *See* Keeton, *supra* note 6, § 130, at 1005.

**8.** *See id.;* Sayre, *supra* note 6, at 665.

**9.** *See* Restatement (Second) of Torts § 766B, cmt. b (1979).

**10.** 2 El. & Bl. 216, 118 Eng. Rep. 749 (Q.B. 1853).

**11.** *See* Sayre, *supra* note 6, at 667–669; Harvey S. Perlman, *Interference with Contract and Other Economic Expectancies: A Clash of Tort and Contract Doctrine*, 49 U. Chi. L.Rev. 61, 63–64 (1982).

**12.** *See* Sayre, *supra* note 6, at 667–669; Perlman, *supra* note 11, at 63–64.

**13.** 1 Q.B. 715 (1893).

**14.** *See* Sayre, *supra* note 6, at 670.

**15.** *Id.*

**16.** *See* Keeton, *supra* note 6, § 130, at 1005; Restatement (Second) of Torts § 766B, cmt. b (1979).

er for *A* to persuade or force *C* to break his contract with *B*. Tortious interference with contract contemplates that competition may be lawful and yet limited by promises already made. Absent any such promises, competitors should be free to use any lawful means to obtain advantage. As one commentator has observed:

> [A]lthough one who interferes with the stability of a contractual relationship may be seen as an interloper and possibly a tortfeasor, one who interferes merely with a "prospective business advantage" may be essentially a competitor. In an economic system founded upon the principle of free competition, competitors should not be liable in tort for seeking a legitimate business advantage.[17]

*Lumley*'s holding that unlawful conduct was not a prerequisite for liability for tortious interference with contract was understandable; *Temperton*'s extension of the same rule to situations involving only prospective relations was not.

The use of "malice" to denote the touchstone of liability for tortious interference with contract was not well explained in *Lumley* and the cases that followed. "Malice" appeared at first to signify malevolence, although it soon became apparent that that definition would not work.[18] As we have explained in a similar context, lawful conduct is not made tortious by the actor's ill will towards another,[19] nor does an actor's lack of ill will make his tortious conduct any less so. "Malice" obviously meant that character of conduct that would

not justify inducing a breach of contract, but that was an obviously circular definition (a person is not justified in inducing a breach of contract if he acts with malice, that is, if he acts in such a way that does not justify inducing a breach of contract). Exactly what conduct was culpable, and therefore "malicious", went undefined.

As clumsy as the idea of "malice" was in describing liability for tortious interference with contract, it made no sense at all in trying to describe liability for tortious interference with prospective advantage. Competitors could quite naturally be expected, well within the bounds of law, to try to achieve the best for themselves and, consequently, harm to each other. In a society built around business competition, interference with prospective business relations has never been thought to be wrongful in and of itself.[20] That some liability factor was essential has never been in doubt. If that factor was not unlawful conduct, discarded by *Lumley* for tortious interference with contract, then it was not clear what it should be.

These two problems—the misassociation of the two torts and the confusion regarding their standards of liability—may have been due to, and were certainly exacerbated by, the concept of a prima facie tort that was being advanced about the same time. As explained by Justice Holmes: "It has been considered that, prima facie, the intentional infliction of temporal damages is a cause of action, which, as a matter of substantive law, whatever may be the form of pleading, requires a justification if the defendant is to escape." [21] In

17. Gary Myers, *The Differing Treatment of Efficiency and Competition in Antitrust and Tortious Interference Law*, 77 Minn. L.Rev. 1097, 1121–1122 (1993).

18. *See* Sayre, *supra* note 6, at 672–674.

19. *Texas Beef Cattle Co. v. Green*, 921 S.W.2d 203, 211 (Tex.1996).

20. *See* Dan B. Dobbs, *Tortious Interference with Contractual Relationships*, 34 Ark. L.Rev. 335, 344 (1980).

21. *Aikens v. Wisconsin*, 195 U.S. 194, 204, 25 S.Ct. 3, 49 L.Ed. 154 (1904) (citations omitted).

other words, intentionally inflicting harm is tortious unless justified. Consistent with this idea, and with the association of the two interference torts,[22] the 1939 *Restatement of Torts* defined tortious interference as simply this:

> [O]ne who, without a privilege to do so, induces or otherwise purposely causes a third person not to (a) perform a contract with another, or (b) enter into or continue a business relation with another is liable to the other for the harm caused thereby.[23]

In determining the existence of a privilege, the *Restatement* called for consideration of

> (a) the nature of the actor's conduct, (b) the nature of the expectancy with which his conduct interferes, (c) the relations between the parties, (d) the interest sought to be advanced by the actor and (e) the social interests in protecting the expectancy on the one hand and the actor's freedom of action on the other hand.[24]

The *Restatement* also stated a privilege for competition when, among other things, "the actor does not employ improper means".[25]

The *Restatement*'s broad statements did almost nothing to define the parameters of tortious conduct.[26] What was it about the nature of an actor's conduct, or of the expectancy at issue, or of any of the other considerations that should or should not result in liability in specific circumstances? Were the considerations the same for interference with a contract and interference with a prospective business relation? When were means of competition "improper"? The *Restatement*'s provisions gave no more guidance than the concept of prima facie tort. Not surprisingly, when the second *Restatement* was published forty years later, it commented:

> [T]here is no clearcut distinction between the requirements for a prima facie case and the requirements for a recognized privilege. Initial liability depends upon the interplay of several factors and is not reducible to a single rule; and privileges, too, are not clearly established but depend upon a consideration of much the same factors. Moreover, there is considerable disagreement on who has the burden of pleading and proving certain matters, such for example, as the existence and effect of competition for prospective business.
>
> This has occurred for two reasons. First, the law in this area has not fully congealed but is still in a formative stage. The several forms of the [interference] tort ... are often not distinguished by the courts, and cases have been cited among them somewhat indiscriminately. This has produced a blurring of the significance of the factors involved in determining liability....
>
> The second reason grows out of use of the term "malicious" in [*Lumley v. Gye*] and other early cases. It soon came to be realized that the term was not being

---

**22.** *See* Dobbs, *supra* note 20, at 344–345.

**23.** RESTATEMENT OF TORTS § 766 (1939).

**24.** *Id.* § 767.

**25.** *Id.* § 768 (stating in part: "One is privileged purposely to cause a third person not to enter into or continue a business relation with a competitor of the actor if (a) the relation concerns a matter involved in the competition between the actor and the competitor, and (b) the actor does not employ improper means, and (c) the actor does not intend thereby to create or continue an illegal restraint of competition, and (d) the actor's purpose is at least in part to advance his interest in his competition with the other.").

**26.** *See* KEETON, *supra* note 6, § 130, at 1010–1011; Dobbs, *supra* note 20, at 344–345.

used in a literal sense, requiring ill will toward the plaintiff as a requirement for imposing liability. Many courts came to call this "legal malice," and to hold that in this sense the requirement means that the infliction of the harm must be intentional and "without justification." "Justification" is a broader and looser term than "privilege," and the consequence has been that its meaning has not been very clear.[27]

Having recognized these problems, the *Restatement* did little to solve them. Concluding that "it has seemed desirable to make use of a single word that will indicate for this tort the balancing process expressed by the two terms, 'culpable and not justified,'"[28] the *Restatement* chose "improper" as a word "neutral enough to acquire a specialized meaning of its own" for purposes of defining the interference torts.[29] The *Restatement* separated interference with contract and interference with prospective business relations, previously combined as one, but it used the same new standard—"improper"—to define liability for each. Hence, section 766B states with respect to intentional interference with prospective contractual relations:

> One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or (b) preventing the other from acquiring or continuing the prospective relation.[30]

The *Restatement* then states that whether conduct was "improper" for both interference torts should be determined from consideration of the same broad factors:

> In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors: (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties.[31]

The second *Restatement,* like the first, provided that lawful competition was not tortious interference with a prospective business relation although it might be tortious interference with any contract not terminable at will.[32]

---

27. RESTATEMENT (SECOND) OF TORTS intro. to ch. 37, at 5 (1979).

28. *Id.* at 6.

29. *Id.*

30. *Id.* § 766B.

31. *Id.* § 767.

32. "Competition as Proper or Improper Interference
    "(1) One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if
    "(a) the relation concerns a matter involved in the competition between the actor and the other and
    "(b) the actor does not employ wrongful means and
    "(c) his action does not create or continue an unlawful restraint of trade and
    "(d) his purpose is at least in part to advance his interest in competing with the other.

Thus, the second *Restatement* abandoned the confusing and overlapping notions of "malice", "privilege", and "justification", but it made little more than a formal distinction between the two interference torts, setting the liability standard for both at "improper" conduct, and it continued the idea that the considerations for determining what was improper were, except for lawful competition, similar for both torts. Commentators since have criticized the *Restatement* as overstating case law. Professor Perlman's analysis of the cases

> suggests that the interference tort [with prospective relations] should be limited to cases in which the defendant's acts are independently unlawful and that if improper motivation is to give rise to liability, it should be based only on objective indicia of activity producing social loss. In most cases, tort law will provide the standard for judging the unlawfulness of the means. At the same time, those courts that have emphasized unlawful means have recognized that sources other than traditional tort law also might define the lawfulness of the defendant's behavior. Incorporation of such sources seems right.[33]

Likewise, Professor Keeton summarized:

> violence or intimidation, defamation, injurious falsehood or other fraud, violation of the criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith, all have been held to result in liability, and

there is some authority which limits liability to such cases.[34]

Two recent cases of note have echoed the same idea after surveying existing case law. In *Della Penna v. Toyota Motor Sales, Inc.*, a car manufacturer required dealers not to sell its vehicles for resale outside the United States in order to protect its dealership network. An exporter sued the manufacturer for tortious interference with his business prospects. The Supreme Court of California rejected the claim as a matter of law, concluding that the manufacturer's conduct was not actionable. Abandoning notions of "malice" and "justification", the court held

> that a plaintiff seeking to recover for an alleged interference with prospective contractual or economic relations must plead and prove as part of its case-in-chief that the defendant not only knowingly interfered with the plaintiff's expectancy, but engaged in conduct that was wrongful by some legal measure other than the fact of interference itself.[35]

The "legal measures" identified by the court were existing tort law and statutes.

Similarly, in *Speakers of Sport, Inc. v. ProServ, Inc.*,[36] the Seventh Circuit concluded that under Illinois law, actionable interference requires conduct that is independently tortious by nature. In that case, one sports agency sued another for interference in obtaining Texas Rangers' catcher Ivan Rodriguez as a client by promising him more than it could deliver. The plaintiff agency sought damages alleg-

---

"(2) The fact that one is a competitor of another for the business of a third person does not prevent his causing a breach of an existing contract with the other from being an improper interference if the contract is not terminable at will." *Id.* § 768.

**33.** Perlman, *supra* note 11, at 97–98 (citations omitted).

**34.** KEETON, *supra* note 6, § 130, at 1009 (citations omitted).

**35.** 11 Cal.4th 376, 45 Cal.Rptr.2d 436, 902 P.2d 740, 751 (1995).

**36.** 178 F.3d 862 (7th Cir.1999).

ing that the defendant agency's conduct was unfair, unethical, and deceitful. The court rejected the argument that actionable interference could be based on conduct that was not independently tortious or otherwise unlawful. As Judge Posner explained in the court's opinion, no other workable basis exists for distinguishing between tortious interference and lawful competition:

> It can be argued ... that competition can be tortious even if it does not involve an actionable fraud ... or other independently tortious act, such as defamation, or trademark or patent infringement, or a theft of a trade secret; that competitors should not be allowed to use "unfair" tactics; and that a promise known by the promisor when made to be unfulfillable is such a tactic, especially when used on a relatively unsophisticated, albeit very well to do, baseball player. Considerable support for this view can be found in the case law.... But the Illinois courts have not as yet embraced the doctrine, and we are not alone in thinking it pernicious. *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal.4th 376, 45 Cal.Rptr.2d 436, 902 P.2d 740, 760–763 (Cal.1995) (concurring opinion).... We agree with Professor Perlman that the tort of interference with business relationships should be confined to cases in which the defendant employed unlawful means to stiff a competitor, and we are reassured by the conclusion of his careful analysis that the case law is generally consistent with this position as a matter of outcomes as distinct from articulation.[37]

Expressly endorsing the legal commentary critical of the development of the law

of tortious interference, *Della Penna* and *Speakers of Sport* demonstrate the importance of decoupling interference with contract from interference with prospective relations, and of grounding liability for the latter in conduct that is independently tortious by nature or otherwise unlawful.

## B

The development of tortious interference law has not fared any better in Texas. This Court first recognized the tort of interference with prospective business relations in 1891, two years before the English case of *Temperton v. Russell.* In *Delz v. Winfree*,[38] a butcher sued two cattle dealers alleging that they had conspired between themselves and with another butcher to refuse to sell him live animals or slaughtered meat "without justifiable cause, and unlawfully, and with the malicious intent to molest, obstruct, hinder, and prevent plaintiff from carrying on his said business".[39] We held that the plaintiff's pleadings stated a cause of action. We stated that while one person could refuse to do business with another "whether the refusal is based upon reason, or is the result of whim, caprice, prejudice, or malice", a person could not induce a third person not to do business with the other without "some legitimate right or interest of his own".[40] We explained further that a person

> has no right to be protected against competition, but he has a right to be free from malicious and wanton interference, disturbance, or annoyance. If disturbance or loss come as a result of competition, or the exercise of like rights by others, it is *damnum absque injuria,* unless some superior right, by

37. *Id.* at 867 (citations omitted).

38. 80 Tex. 400, 16 S.W. 111 (1891).

39. *Id.* at 111.

40. *Id.* at 112.

contract or otherwise, is interfered with. But if it come from the merely wanton or malicious acts of others, without the justification of competition or the service of any interest or lawful purpose, it then stands upon a different footing.[41]

We did not define what would constitute "wanton or malicious" conduct. On remand, the defendants proved that they had agreed not to sell to the plaintiff, or to anyone else, who was indebted to either of them, and that they had never attempted to induce others not to sell to the plaintiff.[42] The trial court rendered judgment on a verdict favorable to the defendants, and the court of civil appeals affirmed.[43]

Thirteen years later, in *Brown v. American Freehold Land Mortgage Co.*,[44] we again held that the plaintiff had pleaded a cause of action for tortious interference. There the plaintiffs claimed to have lost business because the defendant, a competitor, had falsely stated that the plaintiffs were neglectful, irresponsible, and insolvent. Without defining the elements of an interference tort, we stated that if the plaintiffs' allegations proved true, the defendant would be liable for having engaged in "a malicious pursuit ... by means wholly without justification in law or morals".[45] At the trial that followed, the plaintiffs offered evidence that the defendant had made derogatory statements about their business, and the trial court rendered

judgment on a verdict in the plaintiffs' favor, which was affirmed.[46]

Our next case involving allegations of tortious interference with business relations came ninety-two years later. In *Calvillo v. Gonzalez*,[47] the plaintiff, an anesthesiologist, complained that the defendant, another anesthesiologist who had contracted with a hospital to furnish it anesthesiologists "from time to time ... in [his] sole discretion", refused to schedule the plaintiff to work at the hospital.[48] The trial court granted summary judgment for the defendant on all the plaintiff's claims, but the court of appeals reversed and remanded the plaintiff's claim for tortious interference with prospective business relations, indicating that the defendant might not have been justified to act as he did if he was motivated by personal acrimony toward the plaintiff.[49] We reversed and rendered judgment for the defendant, holding that since he had the legal right to act as he did, his good faith or personal motivations were irrelevant.[50]

Most recently, in *Prudential Insurance Co. of America v. Financial Review Services, Inc.*,[51] we acknowledged that "[w]e have never enumerated the elements of a cause of action for tortious interference with prospective contracts" but concluded that it was not necessary to do so to reach a decision in that case.[52] There, the plaintiff had contracted with hospitals to audit

---

41. *Id.* at 112 (quoting *Walker v. Cronin*, 107 Mass. 555, 562 (1871)). *Accord, Olive v. Van Patten*, 7 Tex.Civ.App. 630, 25 S.W. 428 (1894, no writ).

42. *Delz v. Winfree*, 6 Tex.Civ.App. 11, 25 S.W. 50 (1894, no writ).

43. *Id.*

44. 97 Tex. 599, 80 S.W. 985 (1904).

45. *Id.* at 988.

46. *American Freehold Land Mortgage Co. v. Brown*, 54 Tex.Civ.App. 448, 118 S.W. 1106 (1909, writ ref'd).

47. 922 S.W.2d 928 (Tex.1996) (per curiam).

48. *Id.* at 929.

49. *Id.*

50. *Id.* at 929–930.

51. 29 S.W.3d 74 (Tex.2000).

52. *Id.* at 78.

their records to determine whether all services and supplies furnished to patients had been billed, and to invoice insurers for previously unbilled items.[53] When the defendant health insurer complained to its insureds and to the hospitals that the plaintiff was overbilling, the hospitals terminated their agreements with the plaintiff.[54] The plaintiff sued the insurer for intentional interference with the plaintiff's contracts with the hospitals and appeared to allege interference with prospective contracts as well.[55] We concluded that the plaintiff had adduced evidence that the defendant had falsely disparaged the plaintiff's business that precluded summary judgment for the defendant.[56]

Thus, although this Court's decisions clearly recognize a cause of action for tortious interference with prospective business relations,[57] none attempts to state the elements of tortious interference with prospective business relations or to define precisely what conduct is culpable. The courts of appeals, in a number of cases, have not been entirely in agreement on these issues. Most have stated that to recover for tortious interference with prospective business relations a plaintiff must prove that the defendant acted intentionally and maliciously, without privilege or justification, for the purpose of harming the plaintiff.[58] Several courts have omitted the requirement that the defendant act with the purpose of harming the plaintiff,[59] and a few cases state that a defendant may be liable if he acts with malice and without serving any useful purpose of his own.[60] A

**53.** *Id.* at 76.

**54.** *Id.*

**55.** *Id.* at 78.

**56.** *Id.* at 80–83.

**57.** *See also Juliette Fowler Homes, Inc. v. Welch Assocs., Inc.,* 793 S.W.2d 660, 665–666 (Tex.1990) (see cases cited); *Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 689 (Tex.1989).

**58.** *Milam v. National Ins. Crime Bureau,* 989 S.W.2d 126, 131 (Tex.App.—San Antonio 1999, no pet.); *Robles v. Consolidated Graphics, Inc.,* 965 S.W.2d 552, 561 (Tex.App.—Houston [14th Dist.] 1997, no pet.); *Garner v. Corpus Christi Nat'l Bank,* 944 S.W.2d 469, 477 (Tex.App.—Corpus Christi 1997, writ denied); *Winston v. American Med. Int'l, Inc.,* 930 S.W.2d 945, 953 (Tex.App.—Houston [1st Dist.] 1996, writ denied); *Tarleton State Univ. v. Rosiere,* 867 S.W.2d 948, 952 (Tex.App.—Eastland 1993, writ dism'd by agr.); *Coastal Corp. v. Atlantic Richfield Co.,* 852 S.W.2d 714, 719–720 (Tex.App.—Corpus Christi 1993, no writ); *Browning–Ferris, Inc. v. Reyna,* 852 S.W.2d 540, 548 (Tex.App.—San Antonio 1992), *rev'd on other grounds,* 865 S.W.2d 925 (Tex.1993); *American Med. Intern., Inc. v. Giurintano,* 821 S.W.2d 331, 337 (Tex.App.—Houston [14th Dist.] 1991, no writ); *Exxon Corp. v. Allsup,* 808 S.W.2d 648, 659 (Tex.App.—Corpus Christi 1991, writ denied); *Gillum v. Republic Health Corp.,* 778 S.W.2d 558, 565–566 (Tex.App.—Dallas 1989, no writ); *Levine v. First Nat. Bank of Eagle Pass,* 706 S.W.2d 749, 751 (Tex.App.—San Antonio), *rev'd on other grounds,* 721 S.W.2d 287 (Tex.1986); *Lone Star Steel Co. v. Wahl,* 636 S.W.2d 217, 222 (Tex.App.—Texarkana 1982, no writ); *Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Discount Ctrs., Inc.,* 200 F.3d 307, 316 (5th Cir.2000); *C.E. Servs., Inc. v. Control Data Corp.,* 759 F.2d 1241, 1249 (5th Cir. 1985); *Leonard Duckworth, Inc. v. Michael L. Field & Co.,* 516 F.2d 952, 956 (5th Cir.1975).

**59.** *Bradford v. Vento,* 997 S.W.2d 713, 730–731 (Tex.App.—Corpus Christi 1999, pet. granted) (No. 99–0966); *Hill v. Heritage Resources, Inc.,* 964 S.W.2d 89, 124 (Tex.App.—El Paso 1997, pet. denied); *Texas Oil Co. v. Tenneco Inc.,* 917 S.W.2d 826, 831 (Tex. App.—Houston [14 Dist.] 1994), *rev'd on other grounds sub nom. Morgan Stanley & Co., Inc. v. Texas Oil Co.,* 958 S.W.2d 178 (Tex.1997); *Gonzalez v. San Jacinto Methodist Hosp.,* 905 S.W.2d 416, 421 (Tex.App.—El Paso 1995), *rev'd on other grounds sub nom. Calvillo v. Gonzalez,* 922 S.W.2d 928 (Tex.1996).

**60.** *State Nat'l Bank v. Farah Mfg. Co.,* 678 S.W.2d 661, 688 (Tex.App.—El Paso 1984, writ dism'd by agr.); *Morris v. Jordan Finan-*

number of cases emphasize that the plaintiff must prove that the defendant acted with malice,[61] and one case indicates proof of malice and intent is all that is required.[62] But three cases indicate that proof of intentional conduct without justification is sufficient,[63] and three cases mention only that the defendant must be shown to have acted intentionally.[64]

■ Most courts have held that to be "malicious" an act of tortious interference with a prospective business relation must be wrongful or unlawful, and intentionally done without just cause or excuse.[65] An actor's personal motivation in doing what he has a legal right to do is irrelevant.[66]

However, no Texas court has attempted to define what conduct is "wrongful." An actor is often said to have been justified if he had the legal right to do what he did or if he had a colorable right that he exercised in good faith.[67] Thus, justification and malice overlap to at least some extent: a lawful act is justified and not malicious. To complicate matters further, privilege and justification are sometimes used synonymously [68] and sometimes not.[69] Only a few cases involving claims for interference with contract have suggested that the factors listed in section 767 of the *Restatement (Second) of Torts* are helpful in determining whether conduct is privi-

*cial Corp.*, 564 S.W.2d 180, 184 (Tex.Civ. App.—Tyler 1978, writ ref'd n.r.e.); *Davis v. Lewis*, 487 S.W.2d 411, 414 (Tex.Civ.App.—Amarillo 1972, no writ).

61. *Bray v. Squires*, 702 S.W.2d 266, 272 (Tex. App.—Houston [1st Dist.] 1985, no writ) (interference with a business relationship is actionable only if illegal action and malice combine to produce an injury)(citing *State Nat'l Bank v. Farah Mfg. Co.*, 678 S.W.2d at 688–691); *Harshberger v. Reliable–Aire, Inc.*, 619 S.W.2d 478, 481 (Tex.Civ.App.—Corpus Christi 1981, writ dism'd w.o.j.) (venue case)(citing *Davis v. Lewis*, 487 S.W.2d at 414); *Light v. Transport Ins. Co.*, 469 S.W.2d 433, 439 (Tex.Civ.App.—Tyler 1971, writ ref'd n.r.e.); *Martin v. Phillips Petroleum Co.*, 455 S.W.2d 429, 435–436 (Tex.Civ.App.—Houston [14th Dist.] 1970, no writ); *Hampton v. Sharp*, 447 S.W.2d 754, 758 (Tex.Civ.App.—Houston [1 Dist.] 1969, writ ref'd n.r.e.).

62. *RRR Farms, Ltd. v. American Horse Protection Ass'n*, 957 S.W.2d 121, 131, n. 6 (Tex. App.—Houston [14 Dist.] 1997, writ denied) (defining "malice" in this type of action as "the intentional doing of a wrongful act without just cause or excuse").

63. *Santa Fe Energy Operating Partners, L.P. v. Carrillo*, 948 S.W.2d 780, 784, n. 2 (Tex. App.—San Antonio 1997, writ denied) (noting that these elements were submitted without objection); *Herider Farms–El Paso, Inc. v. Criswell*, 519 S.W.2d 473, 476 (Tex.Civ.App.—

El Paso 1975, writ ref'd n.r.e.); *Cooper v. Steen*, 318 S.W.2d 750, 753 (Tex.Civ.App.—Dallas 1958, no writ).

64. *Vireo v. Cates*, 953 S.W.2d 489, 499 (Tex. App.—Austin 1999, pet. denied); *Weakly v. East*, 900 S.W.2d 755, 759 (Tex.App.—Corpus Christi 1995, writ denied); *Caller–Times Pub. Co., Inc. v. Triad Communications, Inc.*, 855 S.W.2d 18, 21 (Tex.App.—Corpus Christi 1993, no writ).

65. *RRR Farms*, 957 S.W.2d at 131 n. 6; *Bray*, 702 S.W.2d at 272; *State Nat'l Bank*, 678 S.W.2d at 689; *Lone Star Steel v. Wahl*, 636 S.W.2d 217, 222 (Tex.App.—Texarkana 1982, no writ).

66. *Calvillo v. Gonzalez*, 922 S.W.2d 928, 929 (Tex.1996) (per curiam).

67. *See, e.g., Santa Fe Energy*, 948 S.W.2d at 784 (citing *Texas Beef Cattle Co. v. Green*, 921 S.W.2d 203, 211 (Tex.1996) (defining justification for purposes of tortious interference with contract)).

68. *See, e.g., Caller–Times Pub. Co.*, 855 S.W.2d at 21; *Morris v. Jordan Financial Corp.*, 564 S.W.2d 180, 184 (Tex.Civ.App.—Tyler 1978, writ ref'd n.r.e.).

69. *See, e.g., Hill v. Heritage Resources, Inc.*, 964 S.W.2d 89, 123–124 (Tex.App.—El Paso 1997, pet. denied).

leged.[70] Although the burden of proving a lack of justification or privilege in a tortious interference with contract case is on the defendant,[71] most courts have placed that burden on the plaintiff in a tortious interference with prospective business relations case.[72]

In attempting to derive from the case law a clearer understanding of what is actionable, it is of some benefit, as Judge Posner and Professor Perlman have observed, to look past the language of opinions and consider the conduct for which defendants have actually been held liable. There are only a few Texas cases in which the plaintiff has recovered. Four involved instances in which the defendant made false statements concerning the plaintiff's business.[73] Two involved conduct that ap-

pears to have been unlawful.[74] In one case, the proprietor of a boarding house and saloon recovered damages against a railroad that threatened to terminate any employee who visited the plaintiff's establishment.[75] The basis for the railroad's threats is not clear from the case. When a defendant's motives were competitive, similar threats were held not to be actionable. Thus, in one case a store owner was held not to be liable for threatening to terminate any employee who traded with its competitor,[76] and in another case a beer manufacturer was held not to be liable for threatening to terminate the lease of any saloon that sold a competing product.[77] Finally, in two federal cases the defendants were held liable for structuring a

**70.** *Hopkins v. Highlands Ins. Co.*, 838 S.W.2d 819, 824 (Tex.App.—El Paso 1992, no writ); *Maynard v. Caballero*, 752 S.W.2d 719, 721 (Tex.App.—El Paso 1988, writ denied); *Boyles v. Thompson*, 585 S.W.2d 821, 832 (Tex.Civ.App.—Fort Worth 1979, no writ).

**71.** *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 689–690 (Tex.1989).

**72.** *See supra* notes 58–59, 63. *But see Prudential Ins. Co. of Am. v. Financial Review Servs., Inc.*, 29 S.W.3d 74, 80 (Tex.2000); *Robles v. Consolidated Graphics, Inc.*, 965 S.W.2d 552, 561 n. 11 (Tex.App.—Houston [14th Dist.] 1997, pet. denied); *Edwards Transports, Inc. v. Circle S Transports, Inc.*, 856 S.W.2d 783, 787 (Tex.App.—Amarillo 1993, no writ); *supra* note 64.

**73.** *Bradford v. Vento*, 997 S.W.2d 713, 732 (Tex.App.—Corpus Christi 1999, pet. granted) (No. 99–0966) (involving defendant who falsely told police that the plaintiff did not own store premises); *Edwards Transports*, 856 S.W.2d at 788 (involving defendant who falsely told the plaintiff's customer that the plaintiff had accused the customer of having an improper relationship with the defendant); *State Nat'l Bank v. Farah Mfg. Co.*, 678 S.W.2d 661 (Tex.App.—El Paso 1984, dism'd by agr.) (involving defendants who made false statements to a creditor to dissuade it from hiring a particular person as CEO); *American*

*Freehold Land Mortgage Co. v. Brown*, 54 Tex. Civ.App. 448, 118 S.W. 1106 (1909, writ ref'd) (involving defendant who falsely told the plaintiff's customer that the plaintiff was neglectful, irresponsible, and insolvent).

**74.** *Light v. Transport Insurance Co.*, 469 S.W.2d 433 (Tex.Civ.App.—Tyler 1971, writ ref'd n.r.e.) (involving an insurer who took one of an agent's customers by writing insurance in violation of state law); *Griffin v. Palatine Ins. Co.*, 235 S.W. 202, 204 (Tex. Comm'n App.1921, jdgmt adopted) (involving a group boycott by several fire insurance companies to prevent a retail grocer from obtaining insurance because he had refused to settle a claim), *jdgmt set aside*, 238 S.W. 637 (Tex. Comm'n App.1922). *Cf. Sheehan v. Levy*, 238 S.W. 900 (Tex. Comm'n App.1922, jdgmt adopted) (holding that labor union that legally required members not to work for a nonmember was not liable for tortious interference).

**75.** *International & G.N. Ry. v. Greenwood*, 2 Tex.Civ.App. 76, 21 S.W. 559 (1893, no writ).

**76.** *Robison v. Texas Pine Land Ass'n*, 40 S.W. 843 (Tex.Civ.App.1897, no writ).

**77.** *Celli & Del Papa v. Galveston Brewing Co.*, 227 S.W. 941 (Tex. Com'n App.1921, jdgmt adopted).

real estate transaction to avoid payment of a broker's commission.[78] In neither case had the plaintiffs contracted for payment of a commission. Neither case cited an earlier Texas court decision holding that a broker was not liable for inducing a seller to use his services rather than another broker's as long as the seller had not contracted to pay a commission.

It appears that in most Texas cases in which plaintiffs have actually recovered damages for tortious interference with prospective business relations, the defendants' conduct was either independently tortious—in the four cases noted, defamatory or fraudulent—or in violation of state law. For the same reasons accepted by the Supreme Court of California in *Della Penna,* and by the Seventh Circuit in *Speakers of Sport,* and advanced by Professor Perlman and other legal commentators, we see no need for a definition of tortious interference with prospective business relations that would encompass other conduct. The historical limitation of the tort to unlawful conduct—"the actor's conduct was characterized by violence, fraud or defamation, and was tortious in character"[79]—provides a viable definition and preserves the tort's utility of filling a gap in affording compensation in situations where a wrong has been done. The concepts of malice, justification, and privilege have not only proved to be overlapping and confusing, they provide no meaningful description of culpable conduct, as the *Restatement (Second) of Torts* concluded more than twenty years ago.

■ We therefore hold that to recover for tortious interference with a prospective business relation a plaintiff must prove that the defendant's conduct was independently tortious or wrongful. By independently tortious we do not mean that the plaintiff must be able to prove an independent tort. Rather, we mean only that the plaintiff must prove that the defendant's conduct would be actionable under a recognized tort. Thus, for example, a plaintiff may recover for tortious interference from a defendant who makes fraudulent statements about the plaintiff to a third person without proving that the third person was actually defrauded. If, on the other hand, the defendant's statements are not intended to deceive, as in *Speakers of Sport,* then they are not actionable. Likewise, a plaintiff may recover for tortious interference from a defendant who threatens a person with physical harm if he does business with the plaintiff. The plaintiff need prove only that the defendant's conduct toward the prospective customer would constitute assault. Also, a plaintiff could recover for tortious interference by showing an illegal boycott, although a plaintiff could not recover against a defendant whose persuasion of others not to deal with the plaintiff was lawful. Conduct that is merely "sharp" or unfair is not actionable and cannot be the basis for an action for tortious interference with prospective relations, and we disapprove of cases that suggest the contrary.[80] These examples are not exhaustive, but they illustrate what conduct can constitute tortious interference with prospective relations.

■ The concepts of justification and privilege are subsumed in the plaintiff's

**78.** *Verkin v. Melroy,* 699 F.2d 729 (5th Cir. 1983); *Leonard Duckworth, Inc. v. Michael L. Field & Co.,* 516 F.2d 952 (5th Cir.1975).

**79.** *See* RESTATEMENT (SECOND) OF TORTS § 766B, cmt b (1979).

**80.** *See, e.g., Light v. Transport Ins. Co.,* 469 S.W.2d 433, 439 (Tex.Civ.App.—Tyler 1971, writ ref'd n.r.e.); *C.E. Servs., Inc. v. Control Data Corp.,* 759 F.2d 1241, 1249 (5th Cir. 1985); *Leonard Duckworth, Inc. v. Michael L. Field & Co.,* 516 F.2d 952, 958 (5th Cir.1975).

proof, except insofar as they may be defenses to the wrongfulness of the alleged conduct. For example, a statement made against the plaintiff, though defamatory, may be protected by a complete or qualified privilege.[81] Justification and privilege are defenses in a claim for tortious interference with prospective relations only to the extent that they are defenses to the independent tortiousness of the defendant's conduct. Otherwise, the plaintiff need not prove that the defendant's conduct was not justified or privileged, nor can a defendant assert such defenses.

In reaching this conclusion we treat tortious interference with prospective business relations differently than tortious interference with contract. It makes sense to require a defendant who induces a breach of contract to show some justification or privilege for depriving another of benefits to which the agreement entitled him. But when two parties are competing for interests to which neither is entitled, then neither can be said to be more justified or privileged in his pursuit. If the conduct of each is lawful, neither should be heard to complain that mere unfairness is actionable. Justification and privilege are not useful concepts in assessing interference with prospective relations, as they are in assessing interference with an existing contract.

### III

■ With this understanding of what conduct is prohibited by the tort of interference with prospective contractual or business relations and what conduct is not prohibited, we return to the evidence of this case. As we have already noted, we must assess Wal–Mart's argument that no

evidence supports a finding of wrongful interference with the plaintiffs' prospective agreement with Fleming Foods in light of the jury charge to which Wal–Mart did not object, even though the charge does not correctly state the law. We must therefore consider whether the plaintiffs offered any evidence from which the jury could find, as the trial court instructed them, that Wal–Mart acted "with the purpose of harming Plaintiffs". As we have shown, however, harm that results only from lawful competition is not compensable by the interference tort. We must look to see whether there is evidence of harm from some independently tortious or unlawful activity by Wal–Mart.

■ The plaintiffs tell us that their interference claim is based on the telephone conversation between Hudson, Wal–Mart's relator, and Callaway, Fleming's manager of store development. Specifically, the plaintiffs complain of Hudson's "ultimatum" to Callaway that if Wal–Mart were not able to acquire Tract 2 for expansion, it would relocate its store. The plaintiffs contend that Hudson's statement was false and therefore fraudulent. To be fraudulent a statement must be material and false, the speaker must have known it was false or acted recklessly without regard to its falsity, the speaker must have intended that the statement be acted on, and hearer must have relied on it.[82] The plaintiffs do not dispute that Wal–Mart had undertaken to identify stores which could not be expanded and to relocate them, that it attempted to acquire Tract 2 as an alternative to relocating the Nederland store, and that as Hudson told Callaway, if Wal–Mart could not acquire Tract 2 it would relocate. The only evidence the plaintiffs cite in

**81.** *See, e.g., Prudential Ins. Co. of Am. v. Financial Review Servs., Inc.,* 29 S.W.3d 74, 82 (Tex.2000).

**82.** *See, e.g., Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.,* 962 S.W.2d 507, 524 (Tex.1998).

support of their contention is that at the time Hudson called Callaway Wal–Mart had not begun efforts to relocate; that as a general matter Wal–Mart preferred to expand rather than relocate; and that there was room on Tract 1 for some expansion of the store. The fact that Wal–Mart had not begun to relocate its store when Hudson talked with Callaway is no evidence that his statement was false. The plaintiffs point to no evidence that Wal–Mart's general preference for expansion over relocation, or the possibilities for some expansion on Tract 1, would have made it decide not to relocate. Indeed, if Tract 1 had been adequate for Wal–Mart's intended expansion, it would not have needed to acquire Tract 2.

■ Thus, no evidence supports the plaintiffs' contention that Hudson's statement to Callaway was fraudulent or that Hudson intended to deceive Callaway, and the plaintiffs do not contend that Wal–Mart's conduct was otherwise illegal or tortious. The record contains no evidence to indicate that Wal–Mart intended the plaintiffs any harm other than what they would necessarily suffer by Wal–Mart's successful acquisition of Tract 2, which they were both pursuing, by entirely lawful means. We therefore conclude that there is no evidence to support a judgment for the plaintiffs on their interference claim.

### IV

■ We must next consider whether the plaintiffs can recover on their breach of contract claim. The plaintiffs allege that Wal–Mart unreasonably refused to consent to Sturges's proposed modification in the site plan in violation of its obligation under the 1982 ECR. Specifically, the plaintiffs contend that Wal–Mart violated the following provision of the 1982 ECR:

> This Agreement (including exhibits) may be modified or cancelled only by Wal–Mart ... as long as it or its affiliate has any interest as either owner or lessee of Tract 1 or 2 together with the written consent of OTR, so long as it has an interest as an owner in Tract 1. Such consents shall not be unreasonably withheld.

The plaintiffs argue that the use of the plural "consents" in the last sentence quoted means that neither Wal–Mart nor OTR could unreasonably withhold consent to a modification. The trial judge held that the provision was ambiguous, and the jury agreed with the plaintiffs' interpretation.

■ If a written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and it can be construed as a matter of law.[83] An ambiguity does not arise simply because the parties advance conflicting interpretations of the contract; for an ambiguity to exist, both interpretations must be reasonable.[84] The plaintiffs' interpretation of the 1982 ECR is not reasonable. By the plain language of the provision, Wal–Mart *alone* could modify the ECR as long as it owned or leased Tract 1 or Tract 2, and OTR's consent was required as long as it owned an interest in Tract 1. It would make no sense for Wal–Mart, which drafted the 1982 ECR, to require its consent to its own proposed modification or cancellation. The most plausible explanation for the use of the plural "consents" is that Wal–Mart

83. *Lenape Resources Corp. v. Tennessee Gas Pipeline Co.,* 925 S.W.2d 565, 574 (Tex.1996); *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex. 1983).

84. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.,* 940 S.W.2d 587, 589 (Tex. 1996).

contemplated the possibility that it might propose more than one modification.

We therefore conclude as a matter of law that Wal–Mart did not breach the 1982 ECR.

## V

■ Finally, Wal–Mart argues that it is entitled to attorney fees if it prevails on the plaintiffs' breach-of-contract claim. Wal–Mart's claim is based on the following provision in the 1982 ECR:

> In the event of a breach or threatened breach of this Agreement, only all record owners of Tract 1 as a group, or all record owners of Tract 2 as a group, or Wal–Mart … so long as it … has an interest as owner or lessee of either Tract 1 or 2, shall be entitled to institute proceedings.... The unsuccessful party in any action shall pay to the prevailing party a reasonable sum for attorney's fees.

Neither Wal–Mart, nor the owners of Tract 1, nor the owners of Tract 2 instituted this proceeding; the plaintiffs did. Therefore, the provision by its plain terms does not apply so as to entitle Wal–Mart to recover attorney fees.

\* \* \* \* \*

For the reasons we have explained, we reverse the judgment of the court of appeals and render judgment that the plaintiffs take nothing.

Justice O'NEILL issued an opinion concurring in part and concurring in the judgment, in which Justice HANKINSON joined.

Justice BAKER did not participate in the decision.

Justice O'NEILL filed a concurring opinion joined by Justice HANKINSON.

Wal–Mart requests a no-evidence review of the jury's tortious interference finding. But the Court strays beyond measuring the evidence against the charge that was given, as we are required to do here, and expounds on what the law should be. While I understand the Court's eagerness to clarify the law in this admittedly unsettled area, I would not do so in dicta but would await the proper case. Thus, I cannot join Parts II or III of the Court's opinion.

I agree, however, that no evidence supports the plaintiffs' tortious interference claim as defined in the charge. For these reasons, I concur in the Court's judgment but not its analysis.

## I

The tortious interference question was submitted and answered as follows:

### Question 6

Did Wal–Mart wrongfully interfere with Plaintiffs' prospective contractual agreement to lease the property to Fleming?

Wrongful Interference occurred if—

a. there was a reasonable probability that Plaintiffs would have entered into the contractual relations, and

b. Wal–Mart intentionally prevented the contractual relations from occurring with the purpose of harming Plaintiffs.

ANSWER: *Yes.*

With one exception not relevant here, neither party objected to this question or proposed any additional instructions. It is well-established that "it is the court's charge, not some other unidentified law, that measures the sufficiency of the evidence when the opposing party fails to

object to the charge.'" *Osterberg v. Peca,* 12 S.W.3d 31, 55 (Tex.2000) (citing TEX.R. CIV. P. 272, 274, 278, 279; *Larson v. Cook Consultants, Inc.,* 690 S.W.2d 567, 568 (Tex.1985); *Allen v. American Nat'l Ins. Co.,* 380 S.W.2d 604, 609 (Tex.1964)). It is our task to analyze the evidence in light of the charge, without digressing into advisory explanations of what we might prefer the charge to have said. The Court acknowledges as much, making its general discourse on tortious interference law wholly advisory.

## II

Wal–Mart argues that no evidence supports the jury's finding on the plaintiffs' tortious interference claim. To prove tortious interference, the court's charge required the plaintiffs to show that (1) there was a reasonable probability that they would have entered into the supermarket lease with Fleming, (2) Wal–Mart intentionally prevented the contract from occurring, and (3) Wal–Mart did so with the purpose of harming the plaintiffs. More than a scintilla of evidence supports the jury's finding on the first two elements, but not the third. *See Orozco v. Sander,* 824 S.W.2d 555, 556 (Tex.1992).

Wal–Mart claims that its purpose was not to harm anyone, but only to compete with the Sturges group to acquire Tract 2. It argues vigorously that liability for tortious interference cannot rest simply on one business's acting to best its competitors. I agree; Texas law encourages economic competition and does not generally subject businesses to tort liability for tough but honest practices. *See English v. Fischer,* 660 S.W.2d 521, 522 (Tex.1983). But at the same time, Texas law prohibits fraud and misrepresentation. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 46 (Tex.1998); *see also* RESTATEMENT (SECOND)

OF TORTS §§ 767 cmt. c, 768 cmt. e, 772(a) (1979). The right to compete would not entitle Wal–Mart to make fraudulent representations, a means of interference that is tortious in itself. *See Prudential Ins. Co. v. Financial Review Serv., Inc.,* 29 S.W.3d 74, 81 (Tex.2000).

To distinguish lawful competition from tortious interference, the Sturges group bore the burden of proving that Wal–Mart's purpose was to harm them by tortious means, in this case fraud or misrepresentation. To do so, the Sturges group had to present more than a scintilla of evidence that Wal–Mart's representation that it would move if it could not, acquire Tract 2 was false. I agree with the Court that the Sturges group failed to meet its burden as set out in the charge, and would reverse the court of appeals' judgment on this basis.

I also agree with the Court that Wal–Mart did not breach any contract with the plaintiffs and that Wal–Mart may not recover attorney's fees. Accordingly, I join parts I, IV, and V of the Court's opinion, and I concur in the Court's judgment.