# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-09-00114-CV

**Bobby J. Smith; Rock Systems Group, L.L.C.; and Lone Star Seating, L.L.C., Appellants**

**v.**

**Royal Seating, Ltd., Appellee**

## FROM THE DISTRICT COURT OF MILAM COUNTY, 20TH JUDICIAL DISTRICT
## NO. 32,005, HONORABLE ED MAGRE, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellee Royal Seating, Ltd., a manufacturer's distributor of auditorium chairs, brought suit against appellants Rock Systems Group, L.L.C., a former dealer for Royal Seating; Lone Star Seating, L.L.C., a competitive distributor of the chairs; and Bobby J. Smith, the owner of both Rock Systems and Lone Star. Royal Seating claimed that appellants tortiously interfered with prospective business relationships based on appellants' conduct in substituting Lone Star for Royal Seating as the distributor in transactions in which Royal Seating and Rock Systems were jointly negotiating with the end users. In two issues, appellants challenge the factual and legal sufficiency of the evidence to support the district court's judgment in favor of Royal Seating on its tortious interference claim. For the reasons that follow, we affirm the judgment of the district court.

# BACKGROUND

Royal Seating was a non-exclusive distributor of auditorium "Alessandria" chairs (the "chairs")[1] for Mobiliario, a manufacturer in Mexico. Mobiliario did not sell its chairs directly to dealers but to distributors, and Royal Seating did not sell directly to end users but to dealers who then sold the chairs to end users. Rock Systems was a dealer for Royal Seating from 2002 to 2006.

In early 2006, Royal Seating, as the distributor, and Rock Systems, as the dealer, were negotiating with three churches in California—Cottonwood Christian Center, Abundant Living Family Church, and First Evangelical Free Church ("the churches")—that were interested in purchasing a large quantity of the chairs as a group. Representatives from both Royal Seating and Rock Systems were involved in the negotiations with the churches. The churches initially agreed to purchase approximately 8,700 chairs and installation services from Rock Systems.[2] Ultimately, Rock Systems did not purchase the chairs for the churches from Royal Seating but from Lone Star Seating, a company Smith formed at the end of 2006.

In October 2007, Royal Seating brought suit against appellants, seeking past due amounts owed on other transactions and damages for breach of fiduciary duty and tortious

---

[1] Royal Seating also manufactures chairs and other furniture, but the type of chair at issue, the "Alessandria" chair, was manufactured by Mobiliario.

[2] Cottonwood Christian Center executed a purchase order dated May 31, 2006, to "Rock Systems Group/Royal Seating Ltd." and an "AIA Document" dated June 2, 2006, with "Rock Systems Group/Royal Seating Ltd."; Abundant Living executed a purchase agreement dated June 1, 2006, to "Rock Systems Group/Royal Seating Ltd." and a subsequent purchase order dated March 23, 2007, to "Rock Systems Group"; and First Evangelical had an unsigned purchase order with "Rock Systems Group/Lone Star Seating Ltd." dated October 2, 2007. Cottonwood Christian Center also made a deposit by check in the amount of $105,487.50, dated "7/12/2006," that was payable to "Rock Systems Group/Royal Seating, Ltd." These documents were admitted into evidence.

interference with contracts and prospective business relationships stemming from the substitution of Lone Star for Royal Seating as the distributor in the transactions with the churches. Royal Seating obtained a summary judgment against Rock Systems on the past due amounts owed on the other contracts, and Royal Seating's remaining claims proceeded to trial to the court in December 2008.[3]

At trial, the witnesses were appellant Smith; Rick Creel, a vice president of Royal Seating; and Gary Pemberton, a former sales employee of Royal Seating from 1997 to August 31, 2006, when he began working with appellants as an independent contractor. The witnesses testified to their respective understandings of the relationship between the parties, the churches, and Mobiliario. Although the witnesses' testimony conflicted concerning whether Royal Seating or Rock Systems first initiated contact with the churches,[4] their testimony was largely consistent concerning the past working relationship between Royal Seating, as Mobiliario's distributor, and Rock Systems, as Royal Seating's dealer; the involvement of both Rock Systems and Royal Seating in the negotiations with the churches; Lone Star's formation; and the ultimate structure of the transactions with the churches that substituted Lone Star for Royal Seating as the distributor.

---

[3] The summary judgment on the past due amounts on the other transactions was incorporated into the final judgment, and Rock Systems has not appealed that portion of the judgment. The district court awarded $195,751.95 on the past due amounts. The district court did not grant judgment in favor of Royal Seating on its breach of fiduciary claims, and Royal Seating has not appealed that determination.

[4] Creel testified that Royal Seating's initial contacts with the churches were through Jensine Bard, a design professional in California, and Steve Lazarian, a construction manager for at least two of the churches; Pemberton testified that Royal Seating's initial contact with the churches was through Smith; and Smith testified that Rock Systems's initial contact with the churches was through another contact in California, Ron Hester.

3

Smith testified that Abundant Living ultimately purchased 3,550 chairs, Cottonwood Christian Center 3,300 chairs, and First Evangelical 1,850 chairs from Rock Systems and that Rock Systems purchased the chairs for the churches from Lone Star. Smith also testified that

- his initial meeting with the churches was in May 2006,

- he received purchase documentation in June 2006 from Abundant Living addressed to "Rock Systems Group/Royal Seating, Ltd.,"

- he contacted Mobiliario in June 2006 about buying direct from it,

- he received a check in July 2006 in the amount of $105,487.50, as a "deposit" that was payable to "Rock Systems Group/Royal Seating, Ltd." from Cottonwood Christian Center,

- he deposited the check into Rock Systems' account without advising Royal Seating of the check,

- he formed Lone Star in December 2006,

- Lone Star became a distributor for Mobiliario and began operations in 2007, and

- he owned and operated both Lone Star and Rock Systems out of his home.

The district court found in Royal Seating's favor on its tortious interference claim and awarded actual damages of $78,300.00 against appellants jointly and severally. The district court entered findings of fact concerning Royal Seating's tortious interference claim including the following:

3. There was a reasonable probability that Royal Seating would have entered into [ ] business relationships with [the churches].

4

4.      [Smith, Rock Systems, and Lone Star] intentionally interfered with the relationships between [the churches] and Royal Seating.

5.      The conduct of Smith, Rock Systems, and Lone Star in interfering with the relationships between Royal Seating and [the churches] was independently tortious and unlawful.

6.      The interference of Smith, Rock Systems, and Lone Star was the proximate cause of damages to Royal Seating.

7.      Royal Seating suffered damages in the amount of $78,300 due to the interference of Smith, Rock Systems, and Lone Star.

The district court also entered conclusions of law concerning Royal Seating's tortious interference claim including the following:

3.      [Smith, Rock Systems, and Lone Star] tortiously interfered with a prospective business relationship between Royal Seating and [the churches].[5]

4.      [Smith, Rock Systems, and Lone Star] are jointly and severally liable to Royal Seating in the amount of $78,300.00 for the tortious interference.

This appeal followed.

**ANALYSIS**

In their first issue, appellants challenge the legal and factual sufficiency of the evidence to support the district court's findings concerning the elements of Royal Seating's tortious interference claim. In their second issue, appellants contend the evidence was legally insufficient to support a finding that Rock Systems interfered with the potential business relationship between

---

[5] Conclusion of law number 3 only listed two out of three of the churches, but neither party raises a complaint concerning the omission.

5

Royal Seating and the churches because "a party to a business relation cannot interfere with itself." At their heart, appellants' issues address the legal effect of appellants' conduct in substituting Lone Star for Royal Seating as the distributor in the transactions with the churches. Appellants urge that they are not liable because Rock Systems had no legal obligation to purchase the chairs from Royal Seating.

### *Standard of Review*

This Court reviews a trial court's findings of fact for legal and factual sufficiency of the evidence by the same standards applied to a jury verdict. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996); *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). A legal sufficiency challenge may be sustained when the record discloses one of the following situations:

> (a) a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; [or] (d) the evidence establishes conclusively the opposite of the vital fact.

*City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). When reviewing a finding for legal sufficiency, the reviewing court considers the evidence in the light most favorable to the judgment, crediting favorable evidence if a reasonable factfinder could, and disregarding contrary evidence unless a reasonable factfinder could not. *Id.* at 807. When considering a factual sufficiency challenge, the reviewing court considers all of the evidence and "should set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

In a case tried to the court, the trial court is the "sole judge of the credibility of the witnesses and the weight to be given their testimony." *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986). The trial court may believe one witness, disbelieve others, and resolve inconsistencies in any witness's testimony. *Id*. at 697.

***Tortious Interference with Prospective Business Relationship***

In their first issue, appellants contend that there was no evidence, or alternatively insufficient evidence, to support the district court's findings that (i) there was a reasonable probability that Royal Seating would have entered into a business relationship with the churches, (ii) appellants intentionally interfered with the relationship between the churches and Royal Seating, (iii) appellants' conduct in interfering with the relationship was independently tortious and unlawful, and (iv) appellants' interference was the proximate cause of damages to Royal Seating. The district court's findings track the elements of a claim for tortious interference with a prospective business relationship. These elements are well established.[6] *See Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 726 (Tex. 2001); *Bradford v. Vento*, 48 S.W.3d 749, 757-58 (Tex. 2001); *Richardson-Eagle, Inc. v. William M. Mercer, Inc.*, 213 S.W.3d 469, 475 (Tex. App.—Houston [1st

---

[6] To establish tortious interference with a prospective business relationship, a plaintiff must prove (i) a reasonable probability that the plaintiff would have entered into a business relationship; (ii) an independently tortious or unlawful act by the defendant that prevented the relationship from occurring; (iii) the defendant did such act with a conscious desire to prevent the relationship from occurring or the defendant knew the interference was certain or substantially certain to occur as a result of the conduct; and (iv) the plaintiff suffered actual harm or damages as a result of the defendant's interference. *See Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 726 (Tex. 2001); *Baty v. Protech Ins. Agency*, 63 S.W.3d 841, 860 (Tex. App.—Houston [14th Dist.] 2001, pet. denied).

Dist.] 2006, pet. denied); *Bright v. Addison*, 171 S.W.3d 588, 598 (Tex. App.—Dallas 2005, pet.

denied); *Baty v. Protech Ins. Agency*, 63 S.W.3d 841, 860 (Tex. App.—Houston [14th Dist.] 2001,

pet. denied).[7]  We review the evidence of each of the challenged elements.

    1.    *Reasonable probability of business relationship*

Appellants contend that there was no evidence that Royal Seating would have entered

into a business relationship with any of the churches because Royal Seating concedes that it only

sells chairs directly to dealers who then sell to end users and that it only attempted to sell the chairs

to Rock Systems for the ultimate use of the churches.  The essence of appellants' argument is that

evidence of a prospective direct sale between Royal Seating and the churches was required to satisfy

this element.

Royal Seating presented evidence concerning its initial contact with the churches, its

pursuit of the sales to the churches for several months in 2006 with Rock Systems, and the churches'

intent to have a business relationship with Royal Seating.  Royal Seating's vice president Creel

---

[7] Appellants contend that Royal Seating also was required to show lack of justification or privilege for appellants' actions.  *See Texas Disposal Sys. Landfill, Inc. v. Waste Mgmt. Holdings, Inc.*, 219 S.W.3d 563, 590 (Tex. App.—Austin 2007, pet. denied).  Although this Court included lack of justification or privilege as an element of a claim for tortious interference with a prospective business relationship in that case, the element was not at issue and its inclusion as an element is not binding precedent, *see Travelers Indem. Co. v. Fuller*, 892 S.W.2d 848, 852 (Tex. 1995) (language is dicta that is a mere expression of opinion on a point or issue not necessarily involved in the case and does not create binding precedent under *stare decisis*), and, in any event, was error.  *See Sturges*, 52 S.W.3d at 726.  The supreme court in *Sturges* explained that the concepts of justification and privilege are subsumed in the plaintiff's proof and that justification and privilege are defenses in a claim for tortious interference with prospective relations only to the extent that they are defenses to the independent tortiousness of the defendant's conduct.  *See id.* at 726-27.  Otherwise, the plaintiff need not prove that the defendant's conduct was not justified or privileged, nor can a defendant assert such defenses.  *See id.*

testified to his recollection of how the potential sales with the churches arose and that the churches intended to do business with Royal Seating:

> [M]y recollection was that they—we were contacted about three churches that [Jensine Bard, a design professional, and Steve Lazarian, a construction manager for the churches] were working with in California, and they wanted—they were interested in Royal Seating's chairs, which was the Mobiliario product out of our product line, and that based on that interest, they wanted to do business with us—the churches wanted to do business with us. And we informed them that we did not sell direct. We are a dealer-based organization, and we informed them that we do not sell direct and that we would have to have a dealer. And so at that point, basically, they said, well, the Royal Seating chairs and the warranty along with [the chairs] is what they were interested in. And then we looked at a dealer that would fit, you know, and would be able to help them in California.

Creel also testified to Royal Seating's expectations that Royal Seating would be the distributor on the transaction with the churches when the churches placed their orders for the chairs with Rock Systems. Similarly, Royal Seating's former employee Pemberton testified that he expected the sales to the churches to take place from Royal Seating.[8]

---

[8] Appellants called Pemberton to testify on their behalf concerning the initial contact with the churches, but Pemberton provided testimony that supported Royal Seating's version of events. During cross-examination, Pemberton testified concerning a letter that he sent to Bard in February 2006 that Royal Seating would pay her a "finder's fee" on the sale to the churches and that he expected the sales to take place from Royal Seating:

> Q.  In [the February 2006 letter], are you telling Ms. Bard that you will pay her $28,000 as a finder's fee on the sale of the chairs to two of these churches in California?
>
> A.  I am telling her that I will pay her $28,000 because she put some initial work into Cottonwood.
>
> Q.  And looking at the second full paragraph there, the middle paragraph, at the end of it, the next-to-last sentence, do you say, "Rock Systems will, in turn,

Correspondence between representatives of Rock Systems, Royal Seating, and the churches during the negotiations was admitted into evidence and was consistent with this testimony. An e-mail dated March 27, 2007, from Lazarian to Smith, copied to Creel and others, expressed the churches' prior understanding and continued desire that Royal Seating be the distributor on the transaction:

> Recently you have informed us of your intention to end your dealership status with Royal Seating. In response I have informed you of my serious concerns about our current orders with you for Royal seats. . . . I had a very good phone conference with [Creel and another employee] of Royal this morning in which we discussed the order. On behalf of these three churches, I have decided to proceed with our order with Royal through you. Since much of what was represented to the churches would be greatly diminished by any departure from our original deal, we cannot change the

---

issue purchase orders to Royal Seating for the chairs"?

A.    Yes.

Q.    And that's what you expected to happen, right?

A.    Yes.

Q.    And in the next sentence, you say "the churches fully intend on using our chairs"?

A.    Yes.

Q.    And you say, "we expect the contracts to be signed in March"?

A.    Yes.

Q.    Okay. And this letter was in February, so a month later, you expected to have a deal done with these two churches?

A.    Right.

10

structure at this time. We will continue to work through you but must have seats that are manufactured and installed with a warranty that runs from Royal.

Since the deal was made with all three churches it must be structured the same for each one. . . . Since Royals' name is everywhere on the information you gave the churches (including the warranty), we must proceed on this basis. The determining factor with First [Evangelical] was the lengthy warranty.

* * *

We all understand that sometimes businesses need to change and adapt to the marketplace. This may be your time to make such a change but we all firmly believe that it should not be at the expense of the people we serve. We would like the Royal/Rock Systems Group team to stay together long enough to get these orders completed.

Thank you for your willingness to cooperate and we look forward to completing these projects with you and Royal.

Lazarian iterated that the churches expected the chairs that they were purchasing to come from Royal and that the extended warranty offered by Royal Seating was an important factor in the decision to purchase the chairs.[9]

Also admitted as exhibits were documents executed by the churches reflecting their intentions to purchase the chairs from both Rock Systems and Royal Seating: (i) a copy of a check

---

[9] Smith testified to his conversations with Lazarian as to the warranty:

Q.     Did [Lazarian] tell you he wanted the warranty that runs from Royal Seating?

A.     He had mentioned he wanted that, yes.

Q.     Did he tell you that the determining factor with First [Evangelical] was the lengthy warranty?

A.     Yes, he did.

in the amount of $105,487.50, dated "7/12/2006," and payable to "Rock Systems Group/Royal Seating, Ltd." from Cottonwood Christian Center that reflects that the payment was a "deposit" for the chairs; (ii) a purchase order from Cottonwood Christian Center to "Rock Systems Group/Royal Seating Ltd." dated May 31, 2006; (iii) an "AIA Document" for furniture between Cottonwood Christian Center and "Rock Systems Group/Royal Seating Ltd." executed by Smith as the "rep. dealer"; and (iv) a "Purchase Agreement" dated June 1, 2006, executed by a representative of Abundant Living and Smith that was titled "Rock Systems Group/Royal Seating Ltd."[10]

Appellants provided conflicting evidence that Rock Systems had the initial contact with the churches through its contact Ron Hester and urge that the e-mail from Lazarian should be discounted, questioning his authority to speak for the churches. But it was within the province of the district court as the fact-finder to resolve the conflicts in the evidence, and the district court could have credited the evidence that the churches desired the Royal Seating warranty, the purchase documents from Cottonwood Christian Center and Abundant Living in 2006, and the check that included "Royal Seating" as a payee to conclude that Royal Seating and the churches would

---

[10] Also admitted as an exhibit were e-mails from May 25, 2006, to May 26, 2006, with the heading "Meeting Notes Follow-Up and Thanks—Cottonwood and Abundant Living!" The initial e-mail was sent by Bard to Lazarian and copied to Pemberton, Smith, Hester, and others. Lazarian replied to Bard, without copying anyone else:

Jensine:

I think we need to make our checks payable to Royal Seating. Will that be a problem? I would feel better in case there is no Rock Systems Group in a year. I like [Smith] but we need to protect Cottonwood and Abundant Living. . . .

12

have entered into a business relationship.[11]  *See McGalliard*, 722 S.W.2d at 696 (district court as the fact-finder "sole judge of the credibility of the witnesses and the weight to be given their testimony").

We conclude that the evidence was legally and factually sufficient to support the district court's finding that there was a reasonable probability that Royal Seating and the churches would have entered into a business relationship.  *See City of Keller*, 168 S.W.3d at 810; *Cain*, 709 S.W.2d at176.

### 2. Intentional interference

Appellants contend that the evidence was insufficient to support the district court's finding that appellants intentionally interfered with the relationship between the churches and Royal Seating.  Regardless of whether Rock Systems or Royal Seating made the initial contact with the churches, the evidence from both parties showed that they were involved jointly in the negotiations with the churches for several months in 2006, that two of the churches sent purchase documentation addressed jointly to Royal Seating and Rock Systems in 2006, and Smith formed Lone Star in December 2006.  Smith testified that his first meeting with the churches in California was in May 2006 and that he first contacted Mobiliario in June 2006 about buying direct from Mobiliario:

Q.    Did you have any direct relationship with Mobiliario in May of 2006?

A.    Not—well no, I guess not, no.  Not that early no.

---

[11]  Even if we assume that a claim of tortious interference with a prospective business relationship requires a direct contractual relationship as appellants contend, the evidence was that Royal Seating would have warranted the chairs directly to the churches.

Q.     And at that point, every Mobiliario chair that you had sold had come through Royal Seating, right?

A.     Yes.

* * *

Q.     Now, in—this was in May of 2006, right?

A.     To the best of my recollection, yes.

Q.     And you went out there [California] thinking you were just meeting with Abundant Living, right?

A.     Yes.

Q.     And it turns out there was a couple more churches involved, right?

A.     Well, at that time, Cottonwood.

Q.     Okay. So suddenly the sales potential doubles, right?

A.     Well, it wasn't a sale. I mean, I went out to talk to them. There was a potential to sell more chairs.

Q.     I'm sorry, maybe you didn't hear my question. I said the sales potential doubled, right?

A.     Yes.

Q.     Okay. So a month after that, in June of 2006, you go and contact Mobiliario about buying direct from them.

A.     That is correct.

Q.     And ultimately, all three of these churches ended up buying through Lone Star rather than Royal, right?

A.     No, they ended up buying through Rock Systems Group.

Q.     Who bought through Lone Star?

A.     Correct.

Smith testified that he did not disclose his negotiations with Mobiliario to Royal Seating at that time. The ultimate substitution of Lone Star, as the distributor in the transaction with the churches, also was not disputed. This evidence demonstrates that appellants acted with a conscious desire to prevent the business relationship between the churches and Royal Seating from occurring. *See Baty*, 63 S.W.3d at 860.

We conclude that the evidence was legally and factually sufficient to support the district court's finding that appellants intentionally interfered with Royal Seating's prospective business relationship with the churches. *See City of Keller*, 168 S.W.3d at 810; *Cain*, 709 S.W.2d at 176.

### 3.     Independently tortious or unlawful conduct

Appellants contend that there was no evidence of any independently tortious or unlawful conduct by them. Relying on their lack of a contract with Royal Seating and the non-exclusivity of Royal Seating's distribution agreement with Mobiliario, appellants urge that Rock Systems, as a dealer in auditorium seating, had the right to purchase the chairs from and sell the chairs to any entity that it chose. Royal Seating does not dispute the nature of its relationship with appellants or Mobiliario, but contends that the evidence supports that appellants committed at least two independent torts—fraud and conversion—in their efforts to interfere with the business

15

relationship between the churches and Royal Seating.[12] Because it is dispositive, we limit our review of the evidence to support that appellants' conduct would be actionable under conversion. *See* Tex. R. App. P. 47.1.

The supreme court in *Sturges* articulated the standard for the element of "independently tortious" conduct:

> By independently tortious we do not mean that the plaintiff must be able to prove an independent tort. Rather, we mean only that the plaintiff must prove that the defendant's conduct would be actionable under a recognized tort.

52 S.W.3d at 726; *see also Addison*, 171 S.W.3d at 598-99 (evidence sufficient to support intentional interference with prospective business relationship; evidence showed that "reasonable probability" that third party would have entered into contract with appellees absent appellant's fraud and breach of fiduciary duty). The issue then is whether the evidence demonstrates that appellants' conduct in interfering would be actionable under conversion.

"The unauthorized and wrongful assumption and exercise of dominion and control over the personal property of another, to the exclusion of or inconsistent with the owner's rights, is in law a conversion." *Waisath v. Lack's Stores, Inc.*, 474 S.W.2d 444, 447 (Tex. 1971). To establish

---

[12] Royal Seating contends that appellants committed fraud by not disclosing that they planned to divert the sales to the churches from Royal Seating to themselves and that they were secretly negotiating with Mobiliario to accomplish this result. *See Bradford v. Vento*, 48 S.W.3d 749, 754-56 (Tex. 2001) (elements of fraud by non-disclosure); *Miller v. Kennedy & Minshew*, *P.C.*, 142 S.W.3d 325, 345 (Tex. App.—Fort Worth 2003, pet. denied) ("The duty to disclose [a material fact] arises when one party knows that the other party is ignorant of the true facts and does not have an equal opportunity to discover the truth. A fact is material if it would likely affect the conduct of a reasonable person concerning the transaction in question.").

a claim for conversion of personal property, a plaintiff must prove that: (1) the plaintiff owned or had legal possession of the property or entitlement to possession; (2) the defendant unlawfully and without authorization assumed and exercised dominion and control over the property to the exclusion of, or inconsistent with, the plaintiff's rights as an owner; (3) the plaintiff demanded return of the property; and (4) the defendant refused to return the property. *See Smith v. Maximum Racing, Inc.*, 136 S.W.3d 337, 341 (Tex. App.—Austin 2004, no pet.).

Smith testified that he did not advise Royal Seating that he had received a check from Cottonwood Christian Center in June 2006 that was made payable to "Rock Systems Group/Royal Seating Ltd." and that he deposited the check into Rock Systems's account:

Q.	And you got this check that had Royal Seating's name on it from Cottonwood, right?

A.	It had—the check read "Rock Systems Group/Royal Seating."

* * *

Q.	And did you ever tell Royal Seating you had that check?

A.	No.

Q.	Did you deposit that check?

A.	Yes.

Q.	You deposited a check with Royal Seating and Rock Systems' name on it into your account, right?

A.	No. The heading of the check first read "Rock System Group/Royal Seating," and it was deposited into the Rock Systems Group account—

Q.	By you?

17

A.      —as a deposit.

Q.      By you, right?

A.      Yes.

Q.      And did you ever forward any of those funds to Royal Seating?

A.      No.

Q.      Did you tell Royal Seating you had them?

A.      No.

Royal Seating's vice president Creel similarly testified that Royal Seating never received the funds and that he was told by church officials about the check.

As to the relationship between Lone Star and Rock Systems, Smith testified that he owned and operated both companies out of his home and that they used his personal fax and computers to conduct business. He testified further as to his companies' respective formation and operation and the transfer of funds between the companies and to himself:

Q.      When you created Rock Systems back in 2002, did you put $100 into that bank account?

A.      To the best of my recollection, yes.

Q.      And that was all the capital that you put into the business, right?

A.      To just open a bank account.

Q.      That's all the capital you put in when you started it, right?

A.      As I recall, yes.

Q.     And when you needed it, you would get cash out of Rock System's bank account to pay your personal expenses?

A.     We had a pay draw—I did.

Q.     And you used that to pay personal expenses, right?

A.     I used pay draw money as it was needed.

* * *

Q.     And is [the owner's equity of Rock Systems] still negative?

A.     Yes.

Q.     Then you created Lone Star in 2006, right?

A.     Yes.

Q.     And again, you just put in $100 to start that business, right?

A.     I believe it was a very small amount to open a bank account, yes.

Q.     And you did not put any money into the business other than that $100, right?

A.     As I recall, that's how we opened the bank account, yes.

Q.     And is it true that Lone Star does not keep financial books or records?

A.     Well, we have—we know—we're beginning to. I mean, we are assembling sales reports and things like that, yes.

Q.     When I took your deposition back in August, did you testify that Lone Star does not keep financial books or records?

A.     Yes, we don't have any yet.

Q.     Okay. Now while Rock Systems was insolvent and not paying the $195,000 that it owed to Royal Seating, during the year 2007, Rock Systems paid Lone Star over half a million dollars, right?

A.     Whatever the sales were.

19

As to the transaction with the churches, Smith further testified that Lone Star acted as the distributor, Rock Systems paid Lone Star for the chairs, Lone Star was insolvent at the end of 2007, and Smith received a monthly draw from Lone Star:

Q.  But as far as Lone Star, any time Lone Star made a sale to Rock Systems, Rock Systems paid for that sale, right?

A.  Whenever the payments were made, eventually, yes.

Q.  And those payments—you know from the sales that were made in 2007 that Rock Systems paid over half a million dollars to Lone Star Seating, right?

A.  That's probably right, yes.

Q.  And Lone Star is paying you a monthly draw, right?

A.  Yes.

* * *

Q.  [Lone Star] was clearly insolvent then [at the end of 2007], right?

A.  Yes.

The district court could have credited this evidence to find that appellants' conduct concerning the check that included Royal Seating as a payee would be actionable under the tort of conversion and that this conduct interfered with the business relationship between Royal Seating and the churches. *See id.* We conclude that the evidence was legally and factually sufficient to support the district court's finding that appellants' conduct in interfering with the relationships between

20

Royal Seating and the churches was independently tortious or unlawful. *See City of Keller*, 168 S.W.3d at 810; *Cain*, 709 S.W.2d at176.

#### 4. *Actual damages*

Appellants contend that there was no evidence that their conduct caused actual damage to Royal Seating or that any of the appellants prevented Royal Seating from selling chairs to the churches. The evidence showed that the transaction with the churches was completed as contemplated with the exception that Lone Star was substituted for Royal Seating as the distributor. Royal Seating's vice president Creel testified that, because of the substitution, Royal Seating lost the sale of 8,700 chairs and that its profit would have been $9 per chair or $78,300—the amount awarded by the district court for Royal Seating's claim of tortious interference. We conclude that the evidence was sufficient to support that appellants' conduct caused Royal Seating damage. *See City of Keller*, 168 S.W.3d at 810; *Cain*, 709 S.W.2d at176. We overrule appellants' first issue.

### Interference by Party to Transaction

In their second issue, appellants contend that the evidence is legally insufficient to support the district court's finding that Rock Systems interfered with a prospective business relationship with the churches because a party to a business relationship cannot interfere with itself. Rock Systems contends that it was a party to all of the business transactions that formed the relationship between Royal Seating, Rock Systems, and the churches.

We agree that a party to a contract cannot tortiously interfere with itself. *See Holloway v. Skinner*, 898 S.W.2d 793, 795 (Tex. 1995). But Rock Systems misstates Royal

21

Seating's claim. Royal Seating did not claim that Rock Systems interfered with a relationship that Rock Systems had with the churches but that Rock Systems interfered with the prospective business relationship between Royal Seating and the churches. Based on this record, the district court could have concluded that Royal Seating and the churches would have entered into a business relationship absent appellants' tortious interference. *See Addison*, 171 S.W.3d at 598-99. We overrule appellants' second issue.

## CONCLUSION

Having overruled appellants' issues, we affirm the district court's judgment.

_____

Jan P. Patterson, Justice

Before Chief Justice Jones, Justices Patterson and Puryear
   Dissenting Opinion by Justice Puryear

Affirmed

Filed: November 6, 2009

22