In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
NO. 09-24-00137-CV

**DREAM LAND INVESTMENT INC. AND ALAA HAMDAN, Appellants**

**V.**

**SANNA ENTERPRISES, INC., MUHAMMAD Z. MALIK, BARKAT ALI KHOJA AND ROZINA KHOJA, Appellees**

_____

**On Appeal from the 128th District Court
Orange County, Texas
Trial Cause No. A210157-C**

_____

**MEMORANDUM OPINION**

Sanna Enterprises, Inc. (Sanna), Muhammad Z. Malik, and Barkat Ali Khoja and Rozina Khoja[1] (collectively "Tenant" or "Lessee") sued Dream Land Investment Inc. and Alaa Hamdan (collectively "Landlord" or "Lessor" or Appellant), seeking a declaratory judgment pertaining to the rental of commercial property. Landlord countersued, seeking similar relief, in addition to damages. Both

---

[1] For ease of reference, we refer to the Khojas by their first names.

parties also sought attorney's fees. The jury and the trial court found in Tenant's favor and this appeal followed.

In three issues, Landlord argues that the trial court erred by (1) exceeding its subject-matter jurisdiction in deciding possession of the property; (2) rewriting the lease instead of interpreting it as a whole; and (3) failing to consider the lease provisions in their totality and failing to give meaning to the lease provision related to waiver.

We affirm the trial court's judgment.

## BACKGROUND

At all times relevant to this case, Landlord has owned a gas station and convenience store in Orange, Texas. In 2008, Landlord leased the property to Tenant with a lease term of January 1, 2009 through December 31, 2019. In January 2013, the parties amended the lease changing the term to January 1, 2013 through December 31, 2028. The amended lease includes the address of the property, the amount of the rent, and assigns responsibility for payment of utilities, maintenance, insurance, and taxes to Tenant. This amended lease also sets forth the following particulars:

IV.

Lessee shall pay to Lessor $40,000.00 one time payment in Jan, 2019 for the last 10 yrs Term and this amount can be paid before the due date at any time for convience [sic] of Lessee. Otherwise this lease will be terminated or voided on Dec, 2018.

2

. . . .

## VI.

Lessee, at its expense, shall maintain and keep the premises in good repair, including, but not limited to, the repairing and replacing of all lighting, heating, air conditioning, plumbing, and other electrical and mechanical equipment and fixtures, and also including all utility repairs in pipes, wiring, or sewerage, provided however, Lessor shall be responsible for all structural problems of the building and roof repairs caused by normal wear and tear.

## VII.

Lessee agrees to accept the premises on possession AS IS. Lessee agrees to surrender the premises to the Lessor at the end of the lease term in good condition, allowing only for reasonable use and wear. Lessee agrees to remove all business signs or symbols placed on the premises by Lessee before redelivery of the premises to the Lessor, and to restore the portion of the premises on which they were placed in the same Or better condition as before their placement.

Lessee can make any alterations, additions, or improvements to the leased premises without the prior written consent of Lessor. All alterations, additions, improvements and fixtures (other than Lessee's unattached, readily movable furniture and office equipment) which may be made or installed by either party upon the leased premises, shall remain upon and be surrendered with the premises and become the property of Lessor at the completion of this lease unless Lessor requests their removal, in which event Lessee shall remove the same and restore the premises of their original condition at Lessee's expense. Lessee shall be entitled to any offset, award, or compensation from Lessor for, Lessee's alterations, additions, or improvements to the leased premises if those agreed to By the Lessor and Lessee in writing.

. . . .

3

## X.

Lessee shall, at Lessee's expense, during the term of this lease, keep all buildings and structures on said premises liability insured includes [sic] any loss or damage by fire for the full fair insurable value of the leased premises but not less than county appraisal real estate value.

. . . .

## XVII.

Lessor's waiver or breach of one covenant or condition of this lease is not a waiver or Breach of others, or of subsequent breach of the one waived. Lessor's acceptance of Rent installments after breach is not a waiver of the breach, except of breach of the covenant to pay the rent installment or installments accepted.

. . . .

## XIX.

Time is of the essence in this lease.

Both Hamdan and Malik initialed each page of the amended lease, and their notarized signatures appear on the final page.

Malik did not pay the $40,000 one-time payment referenced in paragraph IV of the 2013 amended lease. Instead, he continued to do business as before under the original lease, operating the store/gas station and paying Hamdan rent. Although Tenant considered buying the property from Landlord, and the parties discussed possible terms of sale, they did not reach an agreement. Instead, on October 2, 2020, the parties executed another document or agreement stating:

*LEASE AMENDING AGREEMENT*

THIS LEASE AMENDING AGREEMENT dated this 2nd day of October, 2020

BETWEEN:

DREAM LAND INVESTMENT INC and ALAA HAMDAN
(collectively the "Landlord")

OF THE FIRST PART

-AND-

SANNA ENTERPRISES INC and MUHAMMAD MALIK
(collectively the "Tenant")

OF THE SECOND PART

Background

A. The Landlord and the Tenant entered into the lease (the "Lease") dated January 2, 2013, for the premises (the "Premises") located at 7014 HWY 87 N, 7008 HWY 87N, 7004 HWY 87N, 7002 HWY 87N ORANGE TX 77632.

B. The Landlord and the Tenant desire to amend the Lease on the terms and conditions set forth in this lease amending agreement (the "Agreement").

C. This Agreement is the second amendment to the Lease.

IN CONSIDERATION OF the Landlord and Tenant agreeing to amend their existing Lease, and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, both parties agree to keep, perform, and fulfill the promises, conditions and agreements below:

Amendments

1. The Lease is amended as follows:

   a. *CLAUSE II OF THE LEASE IS AMENDED BY EXTENSION OF THE LEASE FOR ADDITIONAL 2 YEARS TILL 12/31/2030.*

   b. *LESSEE WILL CONTINUE PAY PROPERTY TAX AND INSURANCE TILL END OF THIS LEASE PERIOD LESSEE WILL KEEP THE PROPERTY UPDATE AND IN GOOD CONDITION AND LESSEE HAVE 60 DAYS ADVANCE NOTICE TO LESSOR IN WRITING IN CASE OF DEFAULT OR QUIT BUSUNESS.*

   c. *LESSEE WILL DEPOSIT EACH AND EVERY MONTH RENT AMOUNT OF FIVE THOUSANDS DOLLARS TO LESSOR's PROVIDED BANK ACCOUNT.*

   d. *LESSEE WILL HAVE RIGHT OF FIRST REFUSAL TO BUY THE PROPERTY AS HAVE BEEN SET BETWEEN BOTH PARTIES CLAUSE III & IV ARE AMENDED TO EFFACE SO LESSEE WILL UPDATE ALL NEW BRAND REQUIRMENTS INCLUDES SIGNS PUMPS, CANOPY AND POS SYSTEM.*

No Other Change

2. Except as otherwise expressly provided in this Agreement, all of the terms and conditions of the Lease remain unchanged and in full force and effect.

Miscellaneous Terms

3. Capitalized terms not otherwise defined in this Agreement will have the meanings ascribed to them in the Lease. Headings are inserted for the convenience of the parties only and are not to be considered when interpreting this Agreement. Words in the singular mean and include the plural and vice versa. Words in the masculine include

the feminine and vice versa. The words "Landlord" and "Tenant" as used in this Agreement include the plural as well as the singular; no regard for gender is intended by the language in this Agreement.

Governing Law

4. Subject to the terms of the Lease, it is the intention of the parties that this Agreement, and all suits and special proceedings under this Agreement, be construed in accordance with and governed, to the exclusion of the law of any other forum, by the laws of the State of Texas, without regard to the jurisdiction in which any action or special proceeding may be instituted.

IN WITNESS WHEREOF the Landlord and Tenant have executed this Lease Amending Agreement as of the date first above written.

Hamdan's, Malik's, and Khoja's unnotarized signatures follow.

The parties disputed whether Landlord signed the Lease Amending Agreement and whether the Landlord waived the $40,000 payment and agreed to have both those issues submitted to the jury. The jury found that Landlord waived payment and that Hamdan signed the agreement. The parties agreed to allow the trial court to decide all other issues. Four issues were submitted to the jury and the jury responded as follows:

**Question No. 1**
Do you find that Alaa Hamdan signed the October 2, 2020, lease amending agreement?
Answer "yes" or "no".
Answer: Yes

## Question No. 2

Did Sanna Enterprises and Muhammad Malik pay the $40,000.00 option?

Answer "yes" or "no".

Answer: No

## Question No. 3

Did Dream Land and Alaa Hamdan waive the $40,000.00 payment specified in the 2013 lease to be made in January 2019 by Sanna Enterprises and Muhammad Malik?

In connection with this question, the Court instructs you as follows:

If compliance was waived by Dream Land and Alaa Hamdan, failure, if any, of Sanna Enterprises and Muhammad Malik to make the $40,000.00 payment in January 2019 as specified in the 2013 lease is excused.

Waiver is an intentional surrender of a known right or intentional conduct inconsistent with claiming the right. A party's express renunciation of a known right can establish waiver. Silence or inaction for a long period of time can show an intent to yield a known right and constitute waiver.

Answer "yes" or "no".

Answer: Yes

## Question No. 4

If you answered no to Question No. 2 and Question No. 3 then answer Question No. 4. Otherwise do not answer question 4.

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Alaa Hamdan and Dreamland Investment, Inc. for their damages, if any, that resulted from such failure to comply.

Do not add any amount for interest damages, if any.

Answer in dollars and cents for damages, if any.

Direct Damages sustained in the past.

Answer: [the jury did not answer this question.]

The parties submitted the remaining questions to the trial court which included the interpretation of paragraphs VI and X of the 2013 Lease, whether Plaintiffs have an insurable interest in the land and improvements that is the subject of the lease

8

agreement and whether Plaintiffs are in compliance with the lease naming Plaintiffs as a named insured in the policy of insurance insuring the property, and whether Defendants are entitled to any relief on their counterclaim, as well as what amount, if any, the parties are entitled to for attorney's fees.

The trial court rendered judgment for Tenant and made the following orders and findings:

> IT IS ORDERED, ADJUDGED and DECREED that the lease agreement between Plaintiffs, Sanna Enterprises, Inc. and Muhammad Z. Malik, as lessee, and Defendants/Counter[-]Plaintiffs, Dream Land, Inc. and Alaa Hamdan, as lessor, of the Leased Premises consists of the 2013 Lease (attached as Exhibit "B" and incorporated by reference), as amended by the October 2, 2020, Lease Amending Agreement (attached as Exhibit "C" and incorporated by reference), that Plaintiffs have not breached the lease and that Plaintiffs are in compliance with the lease agreement as of the date of this judgment.[2]

> IT IS FURTHER ORDERED, ADJUDGED and DECREED that the Court interprets paragraph VI of the 2013 Lease, as amended by the October 2, 2020, Lease Amending Agreement as follows: (a) "structural" in paragraph VI of the 2013 Lease means the load bearing portions of the building, (b) lessor is responsible to repair all problems in the load bearing portions of the building regardless of causation, and (c) lessor is responsible to repair the roof of the building caused by normal wear and tear only.

> IT IS FURTHER ORDERED, ADJUDGED and DECREED that the Court interprets paragraph X of the 2013 Lease, as amended by the October 2, 2020, Lease Amending Agreement as follows: "full fair insurable value" in paragraph X of the lease means the value of the building as determined by an insurance company to be the replacement cost.

---

[2] The judgment was dated January 18, 2024.

IT IS FURTHER ORDERED, ADJUDGED and DECREED that the Court interprets the 2013 Lease, as amended by the October 2, 2020, Lease Amending Agreement as follows: Plaintiffs have an insurable interest in the land and improvements that is the subject of the lease agreement and Plaintiffs are in compliance with the lease by Plaintiffs being the named insured in the policy of insurance insuring the property.

. . . .

IT IS FURTHER ORDERED, ADJUDGED and DECREED that Defendants/Counter-Plaintiffs, Dream Land Investment, Inc. and Alaa Hamdan, take nothing on their counterclaim against Counter-Defendants, Sanna Enterprises, Inc., Muhammad Z. Malik, Barkat Ali Khoja and Rozina Khoja.

All cost[s] of court are adjudged against Defendants/Counter-Plaintiffs.

IT IS FURTHER ORDERED, ADJUDGED and DECREED that, aside from attorney fees and costs incurred by Plaintiffs in their declaratory judgment action, and court costs awarded above in favor of Plaintiffs and against Defendants/Counter-Plaintiffs, the Court awards no monetary sums to any party as damages.

All writs and processes for the enforcement and collection of this judgment and the costs of court may issue as necessary.

All relief requested in this case and not expressly granted is denied. This judgment finally disposes of all parties and claims and is appealable.

Attorney's fees were tried to the court.

The trial court entered the following award of attorney's fees in Tenant's

favor:

IT IS FURTHER ORDERED, ADJUDGED and DECREED that judgment is granted in favor of Plaintiffs, Sanna Enterprises, Inc. and Muhammad Z. Malik, and against Defendants/Counter[-]Plaintiffs,

10

Dream Land Investments, Inc. and Alaa Hamdan, for Plaintiffs' reasonable and necessary attorney fees that are equitable and just in the amount of $50,000.00 for the prosecution of Plaintiffs' declaratory judgment action through this judgment and costs incurred, exclusive of court costs, in the amount of $10,107.12, for a total judgment in the amount of $60,107.12.

The Court further ORDERS that if Defendants/Counter[-]Plaintiffs unsuccessfully appeal this judgment to an intermediate court of appeals, Plaintiffs will additionally recover from Defendants/Counter-Plaintiffs in the amount of $6,000.00, representing the anticipated reasonable and necessary fees and expenses that would be incurred by Plaintiffs in defending the appeal.

The Court further ORDERS that if Defendants/Counter-Plaintiffs unsuccessfully petition the Texas Supreme Court for review, Plaintiffs will additionally recover from Defendants/Counter-Plaintiffs the amount of $3,000.00, representing the anticipated reasonable and necessary fees and expenses that would be incurred by Plaintiffs in defending the petition for review.

The Court further ORDERS that if Defendants/Counter-Plaintiffs are successful in requesting the Texas Supreme Court to review the case but are unsuccessful in the Texas Supreme Court, Plaintiffs will additionally recover from Defendants/Counter[-]Plaintiffs the amount of $1,800.00, representing the anticipated reasonable and necessary fees and expenses that would be incurred by Plaintiffs in preparing their brief on the merits in the Texas Supreme Court.

The Court further ORDERS that if the Texas Supreme Court sets the review for oral argument and Defendants/Counter-Plaintiffs are unsuccessful in the Texas Supreme Court, Plaintiffs will additionally recover from Defendants/Counter-Plaintiffs the amount of $3,000.00, representing the anticipated reasonable and necessary fees and expenses that would be incurred by Plaintiffs in defending the review in the Supreme Court.

IT IS FURTHER ORDERED, ADJUDGED and DECREED that interest is granted in favor of Plaintiffs and against

11

Defendants/Counter-Plaintiffs on the sums awarded above at the rate of 8.25% per year from the date this judgment is rendered until all amounts are paid in full.

We summarize the trial testimony below.

<u>Muhammad Malik's Testimony</u>

Malik testified that when he first came to Orange County, he worked for Barkat Khoja at a convenience store located on I-10. In 2009, Malik's current location became available to rent, and since then, Sanna (consisting of Malik, Barkat, and Rozina) has leased that store from Hamdan. According to Malik, when Malik, Barkat, and Rozina began to operate the store, it was "really in bad condition, like it need some remodeling and work on the – gas pump was old, gas canopy was tear up, and it was like not clean." For "a couple of years[,]" Malik and Rozina operated the store by themselves but continued to work in the store even after they hired employees. By the time of trial, they worked only occasionally, such as when an employee was unable to work.

Malik testified that he did not know who drafted the lease that went into effect in 2009 but later he stated that Hamdan "prepared that lease [and] brought it to us."

According to Malik, beginning in about 2017, the parties contemplated Sanna buying the store from Hamdan, but that expectation was never realized. The following year, Malik brought needed repairs to Hamdan's attention, and Hamdan told Malik to make the repairs and "[d]on't worry about the 40,000[]" since Malik

12

would be buying the store. Malik and Barkat made the needed upgrades, spending "way over 40,000." Hamdan did not raise the matter of the $40,000 payment until March 2021, when Hamdan's attorney sent an eviction notice.

Malik acknowledged that until Hamdan requested to be named as an insured on the insurance policies Malik purchased to cover the property, Hamdan was not designated as an insured. Malik also acknowledged having made approximately three claims against that insurance coverage. In one such claim, Malik received $16,000 to reshingle the roof after it sustained hurricane damage. Malik used the claim's proceeds to repair the damage, which was repaired by a company Malik owns. In another claim, Malik received about $3,000 when someone hit a pump, and Malik could not recall the details of the third claim. All these claims were paid to Sanna.

Malik testified that the 2020 Lease Amending Agreement came about because Hamdan had a dispute with Pak Oil, his former fuel supplier at the store. Hamdan therefore wanted to find an alternate fuel supplier that was acceptable to Exxon, so they could keep the Exxon branding at the store. Malik and Barkat located a new supplier, Sunshine Petroleum. Sunshine Petroleum, however, required a ten-year commitment, but the lease between Malik and Hamdan was due to expire in eight years. Barkat therefore spoke to Hamdan about a lease extension and told Malik that Hamdan wanted Malik to draft a lease extension and let him know when it was ready.

13

Malik drafted the Lease Amending Agreement, he and Barkat signed it, and on October 2, 2020, Barkat took it to Houston for Hamdan to sign. Barkat also gave Malik the other paperwork to take to Sunshine Petroleum. Malik and Barkat met at the house in Richmond, where Barkat gave Malik the signed Lease Amending Agreement and Malik took it to Sunshine Petroleum's office. The combination of the Lease Amending Agreement and the fuel contract enabled Sunshine Petroleum to succeed Pak Oil as the store's fuel supplier. Malik testified that he "would never sign on the fuel contract for 2030 if I don't have extension."

According to Malik, in a departure from Hamdan's usual practice, Malik noticed that Hamdan had apparently signed the Lease Amending Agreement with only his English signature and did not add his Arabic signature. When Malik asked Barkat about this discrepancy, Barkat replied that Hamdan had signed it, but "he was in a hurry maybe, he just signed it. Just, that's all that matter."

In February 2021, Malik, Barkat, and Hamdan met in Houston. When Malik produced a copy of the Lease Amending Agreement, Hamdan stated, "'[t]his is not my sign, and I can deny in the court.'" Hamdan requested a notarized lease, but when Malik told Hamdan that the lease was not notarized because Hamdan and Barkat trusted each other, Hamdan responded, "'I see you in the court.'" Malik believed that Hamdan denied signing the Lease Amending Agreement because Hamdan

14

wanted $150,000 to sign a new lease but Malik responded, "'[w]hy would we have to pay 150,000 if we have already lease?'"

Alaa Hamdan's Testimony

Hamdan testified that he worked in his father's convenience stores, including the store that is the subject of this case, as a teenager, before earning a finance degree. When Hamdan and his brother began an import and warehouse businesses, it became difficult for Hamdan to handle these businesses while running the store, so they decided to lease the subject location.

When the initial lease expired in 2013, Malik began leasing not only the store, but the adjacent offices from Hamdan. The renewed lease included a $40,000 payment if Malik decided to renew the lease again in 2018. According to Hamdan, Malik was supposed to make that payment on December 31, 2018 or January 1, 2019.

When a hurricane struck the area, in August 2020, the store sustained roof damage. Hamdan mentioned filing an insurance claim, to which Malik responded that the insurance company had denied the claim, so he would make his own repairs. Hamdan then researched the coverage on the store and learned that Sanna was listed as the property owner.

Hamdan listed the actions that he considered to be lease violations, including not naming him as an insured; post-hurricane roof repair without Hamdan's consent;

15

and collecting insurance proceeds for roof damage. According to Hamdan, "everything went south[]" between the parties when Malik repaired the hurricane roof damage without Hamdan's involvement, since Malik thus deprived Hamdan of the ability to ensure that the roof was properly repaired. Hamdan consequently requested Malik to "'sign a long-term lease contract with me or just purchase the building and let me move on[,]'" to which Sanna responded that it was "'not interested in buying the building at this time, and we have a lease amendment until December 30, 2030.'" Hamdan testified that was the first time he heard of the lease amendment. When Hamdan saw the Lease Amending Agreement, he denied that he had signed it and accused "that all this amendment is being forged." He testified that he signs documents with both his English and Arabic signatures, and that without both English and Arabic, he would not intend it to be his signature. Moreover, Hamdan testified that he typically handles similar transactions by signing at the same time as the other party and by having his signature notarized. He denied agreeing to the terms in the Lease Amending Agreement, stating that Malik gave contradictory testimony in that Malik claimed Hamdan did not communicate with him yet "stated that he wrote the agreements. How you write an agreement without communicating with the party that they [are] going to sign it?" Hamdan further denied forgiving the $40,000 and claimed that Malik or Barkat once met him in the parking lot of the mosque and acknowledged owing the money.

16

Recalling the events of October 2020, Hamdan testified that he and Barkat met on October 1st, and that Barkat presented Hamdan the fuel contract that needed to be signed immediately due to an impending deadline. After Hamdan's lawyer approved the contract, Hamdan signed it and had it notarized, and left it for Barkat to retrieve later. The following day, Barkat called Hamdan, stating that Hamdan had failed to sign one page of the fuel contract. Hamdan signed the ten-year fuel guarantee on October 2nd at Moez Dhuka's gas station. They did not discuss the lease amendment at that time, but when Hamdan later examined this document, he observed that only the first page was initialed, although the third page appeared to bear his signature. Hamdan stated that he signed only the ten-year fuel agreement guarantee on October 2nd but acknowledged that he does not read documents before signing them. In particular, Hamdan testified that he did not read the document he signed on October 2nd because he did not want to. Hamdan testified that thereafter, he "was waiting for them to come up with a new lease agreement[,]" but nobody contacted him about a new lease until much later, when they provided the Lease Amending Agreement.

Hamdan also testified that on October 2nd, he declined to sign the second page of the document presented to him, since it contained language about buying and selling that he wanted to read before signing.

17

Barkat Ali Khoja's Testimony

Barkat testified that he was one of the owners of Sanna. He recalled that pursuant to Hamdan's request, he helped Hamdan grow Hamdan's Houston business by introducing him to business contacts. Moez Dhuka, however, complained to Barkat that Hamdan's employee was not opening the business on time and Hamdan was not paying his rent on time and "walked out to break the lease."

According to Barkat, Hamdan stated "several time[s]" that Tenant need not pay him the $40,000 referenced in the 2013 lease but did not put this alleged waiver in writing. Barkat stated that Hamdan told Tenant to spend the money on property upgrades since Landlord and Tenant were contemplating the sale of the property to Tenant. The sale was not completed, since Swati Enterprises/Pak Oil, the property's fuel supplier, sued Hamdan. Due to Hamdan's conflict with Pak Oil, Hamdan was seeking a different Exxon-approved fuel supplier and chose Sunshine Petroleum. Sunshine Petroleum required both Tenant and Landlord to sign the fuel supply contract, so Barkat took the contract to Hamdan on October 1, 2020. When Barkat told Hamdan that Sunshine Petroleum required a ten-year contract, and that Tenant therefore needed a two-year extension on its lease, which then had only eight years left to run, Hamdan responded, "'I don't have time. My lawyer is in Houston, blah-blah-blah. So, can you tell Malik [to] make it?'" Barkat relayed this request to Malik, who agreed to draft the lease extension.

18

According to Barkat, on October 2, 2020, Malik gave Barkat the lease extension and Barkat met Hamdan at Dhuka's store in Houston, where Hamdan signed the lease extension as Barkat watched. Barkat then drove to Richmond, where he met Malik and gave Malik the signed lease extension. Malik then took the lease extension and the Sunshine Petroleum contract to Sunshine Petroleum's Houston office.

Barkat believed Malik explained the content of the lease extension to him but acknowledged that he did not read the lease himself. Barkat therefore did not know whether Malik's explanation was accurate. When Hamdan stated that he could deny the authenticity of his signature because he signed the lease in English, only, Hamdan told Dhuka, "'I can go to court, deny my signature. I sign it but I'm going to deny it. You cannot prove because I see the Arabic sign.'" Barkat then replied that if Hamdan did so, a handwriting expert would expose him.

Rozina Khoja's Testimony

Rozina, Barkat's wife, testified that on October 2, 2020, she and Barkat were on their way to Richmond when they stopped at a convenience store to get Hamdan's signature on the store lease amendment. The convenience store where they stopped was owned by her nephew, Moez Dhuka.

When Barkat exited their vehicle, he handed Hamdan a folder. Barkat and Hamdan then shook hands, Hamdan "signed it first page, then he turned the page

19

and then he signed the end of the page." After signing, Hamdan gave the document back to Barkat, the two men shook hands again, and Barkat returned to their vehicle and handed the folder and documents to Rozina. When Rozina opened the folder, she saw that Hamdan had initialed the first page and signed the second page.

Hina Hussain's Testimony

Hussain, the Khojas' niece, testified that on October 2, 2020, she accompanied the Khojas to a family gathering in Richmond. On the way to Richmond, they stopped at a convenience store. When Hussain asked the purpose of the stop, Rozina replied that they "'need[ed] to meet our landlord to sign the amendment of the lease documents[.]'"

Barkat exited the vehicle, approached Hamdan, and the two of them shook hands. Barkat then handed Hamdan a file, Hamdan opened it and signed the paperwork. Hamdan gave the paperwork back to Barkat, the two men again shook hands, Barkat returned to the vehicle, and Barkat, Rozina, and Hussain continued to Richmond. Although Hussain could not see what Hamdan signed, she recalled that he "did sign the first page, turned over, and then did another page." Hussain characterized the interaction between Barkat and Hamdan as "pleasant[.]"

Moez Ali Dhuka's Testimony

Dhuka testified that Barkat, his uncle, introduced him to Hamdan, and that Hamdan leased four store spaces from Dhuka. According to Dhuka, Hamdan continued to lease one location but Hamdan defaulted on the other three leases.

Dhuka recalled that on October 2, 2020, he met Hamdan at the store on Chimney Rock at Highway 59 to discuss the non-payment of rent and the failure to open the business on time. While Hamdan was at the store, Barkat arrived with documents to be signed. Dhuka understood that Barkat needed Hamdan to sign some documents regarding the store in Orange County that Barkat and others were leasing from Hamdan.

Dhuka saw Hamdan and Barkat meet in the parking lot outside the store and saw Barkat give Hamdan a paper to sign. Dhuka then saw Hamdan sign the paper, after which Barkat took the paper back to his vehicle and left. Dhuka agreed that the meeting between Barkat and Hamdan was cordial. Although Dhuka could not hear Hamdan and Barkat's conversation, and did not see the paper Hamdan signed, Barkat told him that he was on his way to sign lease documents.

On February 4, 2021, Dhuka met with Malik and Hamdan to try to help them come to an agreement. During that meeting, Barkat or Malik produced the Lease Amending Agreement allegedly signed at the Chimney Rock location on October 2, 2020, but when Hamdan looked at the document, he said, "'this is not my signature,

21

you know.'" When Dhuka reminded Hamdan that he had signed it, Hamdan replied, "yes, I signed, but I can deny that one in the court[,]" meaning that Hamdan had signed his name in English but had not added his Arabic signature as he usually did. Dhuka then cautioned Hamdan that if Hamdan did so, "a writing expert will catch you, you know. It is not the way out, you know."

Brenda Petty's Testimony

Petty, a forensic document examiner retained by Tenant, testified about her training, credentials, experience, and expertise in her field. Petty described her work as "examination of wills and deeds and warranties[,]" examining documents to determine whether signatures are authentic. Petty explained her approach to signature authentication as

> [A]nalyze, compare, and evaluate. Analyze being that we go through and we look at all of the documents and we begin to make judgment calls about that document, if the handwriting is different, if the handwriting is the same. I look at all of the known signatures. I compare the questioned signatures with the questioned signatures, the known signatures with the known signatures so that I can have a good understanding if there are any differences between the signatures or anything that immediately catches the eye.

Petty then loads the signatures into a computer program so that she can "begin to compare stroke to stroke, movement to movement, slant to slant, position on the signature line, position of letter to letter." According to Petty, when she has an original document, she can examine it under a microscope to ensure that the questioned signature was signed with a pen, as opposed to printer ink. She explained

22

that when a document is copied or scanned, "[t]here is a difference in the lighting of it and the way the light reflects." In addition, Petty noted that "in simulated signatures there is usually starts and stops in it. It's usually written slower."

To determine whether Hamdan signed the Lease Amending Agreement, Petty first examined a copy of the questioned document, then examined the original document and compared it with ninety-four exemplars of Hamdan's signature.[3] Petty testified that Hamdan had "what is considered a wide range of natural variation[]" in his signature, meaning that "each time he signs his signature, it can be very, very different from the previous time that he signed his signature because he has a wide range of variation." Petty noticed that Hamdan's questioned signature "was written quickly, it was written with a right slant, it was written without any starts or stops, and those were very particular to the examination." Moreover, in Petty's opinion, "[t]he hue of the ink was the same, and the flow of the ink was the same in both the initials and the signature[,]" leading her to conclude "[t]hat the initials and the signature would have been written with the same writing instrument." Petty testified, however, that based on her examination of the document, Hamdan did not initial the second page of the document. Petty concluded that Hamdan's signature on the Lease Amending Agreement was genuine.

---

[3] When it was determined that two of the exemplars furnished to Petty were not Hamdan's, Petty removed those signatures from her consideration.

23

When asked about the differences between page one and page two of the document, Petty noted that they were on opposite sides of the same paper, and that portions of page two were capitalized and italicized but she did not agree that the two pages were written in different fonts.

<u>Exhibits</u>

Lease (2008)

Lease (2013)

Text message exchanges

Sanna's upgrade expenses

Memorandum of Agreement (between Sanna/Malik and Sunshine Petroleum)

Agreement and Restrictive Covenant (among Dream Land, Sanna/Malik, and Sunshine Petroleum, and signed by Feroz Panjwani on behalf of "SUPPLIER" Sunshine Petroleum, Alaa Hamdan as "OWNER" Dream Land Investment, Inc., and Muhammad Zafeer Malik as "TENANT" Sanna Enterprises, Inc.)

Lease Amending Agreement

Offer to sell – February 13, 2020

Letter forwarding copy of Lease Amending Agreement – March 17, 2021

Letter denying Hamdan's signature – March 22, 2021

Notice to Vacate – March 22, 2021
Email exchanges re: sale or lease of property

Brenda Petty's report and curriculum vitae (with signature exemplars)

**ANALYSIS**

Issue One: Jurisdiction

In the first issue, Landlord argues that the trial court "exceeded its subject matter jurisdiction when it made a ruling about the possession of the property which was exclusively in the jurisdiction of the JP Court[.]" Landlord's brief references the legislative history of forcible entry and detainer and states that jurisdiction over such cases lies exclusively in justice courts, since "the controversy surrounds possession of the property and whether there were lease violations[.]" Therefore, Landlord argues, "the declaratory judgment does nothing to end the dispute between the parties."

Whether a court has subject matter jurisdiction is a question of law we review de novo. *Tex. Dep't. of Parks and Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). A court may not decide a case unless it has subject matter jurisdiction. *Id.* A plea to the jurisdiction challenges the trial court's power to exercise subject matter jurisdiction. *Id.*; *City of Waco v. Kirwan*, 298 S.W.3d 618, 621–22 (Tex. 2009). The Texas Constitution and the Texas Property and Government Codes set forth the jurisdiction of both district and justice of the peace courts, as follows:

> District Court jurisdiction consists of exclusive, appellate, and original jurisdiction of all actions, proceedings and remedies, except in cases where exclusive, appellate, or original jurisdiction may be conferred by this Constitution or other law on some other court, tribunal, or administrative body. District Court judges shall have the power to issue writs necessary to enforce their jurisdiction.

25

Tex. Const. art. V, § 8.

> Justice of the peace courts shall have original jurisdiction in criminal matters of misdemeanor cases punishable by fine only, exclusive jurisdiction in civil matters where the amount in controversy is two hundred dollars or less, and such other jurisdiction as may be provided by law. Justices of the peace shall be ex officio notaries public.

Tex. Const. art V, § 19.

> (a) . . . [A] justice court in the precinct in which the real property is located has jurisdiction in an eviction suit. Eviction suits include forcible entry and detainer and forcible detainer suits. A justice court has jurisdiction to issue a writ of possession under this chapter.

Tex. Prop. Code Ann. § 24.004(a).

> (a) In addition to the jurisdiction and powers provided by the constitution and other law, the justice court has original jurisdiction of:
>
> . . . .
>
> (2) cases of forcible entry and detainer[.]

Tex. Gov't Code Ann. § 27.031(a)(2).

The Uniform Declaratory Judgments Act (UDJA) expressly permits a court of record "to declare rights, status, and other legal relations" regarding a "written contract[.]" Tex. Civ. Prac. & Rem. Code Ann. §§ 37.003(a), 37.004(a).

When Tenant filed suit, he asked the trial court to declare

> [T]hat the lease agreement between Plaintiffs [Tenant] and Defendants [Landlord] . . . consists of the 2013 lease as amended by the October 2020 amendment of the lease, that Plaintiffs are in compliance with the lease agreement and that Defendants have no basis to claim the lease expired and no basis to evict Plaintiffs.

26

Tenant's Second Amended Original Petition for Declaratory Judgment, its live pleading at the time of trial, requests the same relief set forth above, and further requests the court to interpret the lease terms "structural[,]" "full fair insurable value[,]" and "Lessor shall be responsible for all structural problems of the building and roof repairs caused by normal wear and tear[.]" In addition, Tenant requests the court to declare that it had an insurable interest in the building due to its repair obligation.

A case seeking a declaratory judgment must be filed in a court of record. *See id.* § 37.003(a). Since the district court where Tenant filed its case is a court of record and a justice court is not, Tenant invoked the trial court's jurisdiction when it sought a declaratory judgment of its rights under the lease and the later Lease Amending Agreement. *Compare Tex. Emp. Comm'n. v. Norris*, 636 S.W.2d 248, 251 (Tex. App.—Beaumont 1982, writ ref'd n.r.e.), *with Golden v. Milstead Towing & Storage*, Nos. 09-21-00043-CV, 09-21-00044-CV, 09-21-00045-CV, 2022 Tex. App. LEXIS 2988, at *5 (Tex. App.—Beaumont May 5, 2022, no pet.) (mem. op.). Landlord's contention that the trial court "exceeded its jurisdiction" by awarding possession to Tenant lacks foundation in the record because the trial court did not award possession in its judgment. We conclude that the court's judgment does no more than make the lease interpretations and other declarations requested of it. *See*

27

*Westwood Motorcars, LLC v. Virtuolotry, LLC*, 689 S.W.3d 879, 881-85 (Tex. 2024).

In *Westwood Motorcars*, the plaintiff sued in district court seeking a declaratory judgment that it had not breached its lease and that it had a valid right to extend the duration of its lease of commercial real estate. *Id.* at 881. Based on a jury verdict, the district court rendered judgment for the plaintiff. *Id.* at 882. The *Westwood Motorcars* court considered the possibility that a justice court's determination of the immediate right of possession might conflict with the outcome of a suit in district court. *Id.* at 883-84. The court was not troubled by this possibility, noting that "the justice court's judgment 'is a determination only of the right to *immediate possession* and does not determine the *ultimate* rights of the parties to any other issue in controversy relating to the realty in question.'" *Id.* at 884 (quoting *Lopez v. Sulak*, 76 S.W.3d 597, 605 (Tex. App.—Corpus Christi–Edinburgh 2002, no pet.)). Applying the rationale of *Westwood Motorcars* to this case, even if a justice court had made a determination of immediate possession, such a ruling would not preclude the trial court in this case from ruling on Tenant's overall right to occupy the property under the lease being interpreted. *See id.* at 885.

We overrule Landlord's first issue.

Issue Two: Lease Interpretation

In its second issue, Landlord argues that the trial court "exceeded its jurisdiction[]" in that it "declared the tenant had been in compliance and was entitled to possession." We addressed Landlord's "entitled to possession" argument above and again observe that the trial court did not award possession in its judgment. Landlord also complains that the trial court did not "interpret[] the lease as a whole[,]" in that the court did not address the language in the Lease Amending Agreement requiring Lessee to "pay property tax and insurance till the end of this lease period [and] Lessee will keep the property updated and in good condition[.]"

The primary objective in construing a contract is to implement the parties' intent. *See Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 888 (Tex. 2019). We interpret contract language according to its plain, ordinary, and generally accepted meaning unless the contract directs otherwise. *See id.* We consider the writing as a whole to harmonize and give effect to all the provisions so that none will be rendered meaningless. *See id.* at 889. When a contract is not ambiguous, meaning that its language "lends itself to a clear and definite meaning," the contract will be construed as a matter of law. *Great Am. Ins. Co. v. Primo*, 512 S.W.3d 890, 893 (Tex. 2017). Ambiguity arises "when the contract is actually 'susceptible to two or more reasonable interpretations.'" *Id.* (citation omitted).

29

Ambiguity is a question of law that we review de novo. *See Scout Energy Mgmt., LLC v. Taylor Props.*, 704 S.W.3d 544, 548 (Tex. 2024).

In this case, Landlord argues that the trial court should have "rule[d] that the lease is not ambiguous and give meaning to the language of the parties that establishes a triple net lease where the tenant is responsible for all maintenance, taxes, and insurance, in addition to the rent obligation." Tenant, however, does not dispute its responsibility to pay for maintenance, taxes, insurance, and rent, as these responsibilities were also set forth in the 2013 lease and were reaffirmed by the 2020 Lease Amending Agreement. Consequently, the trial court's omission of the language Landlord suggests would not affect the resolution of the parties' dispute over the validity of the Lease Amending Agreement. *See Suniverse, LLC v. Universal Am. Mortg. Co., LLC*, No. 09-19-00090-CV, 2021 Tex. App. LEXIS 1240, at *40 (Tex. App.—Beaumont Feb. 18, 2021, pet. denied) (mem. op.) ("A declaratory judgment is appropriate if a justiciable controversy exists concerning the rights and status of the parties that may be resolved by the declaration sought[.]").

We overrule Landlord's second issue.

Issue Three: Waiver of Option Payment

In Landlord's third issue, Landlord argues that the trial court erred by failing to "consider the lease provisions in their totality and failing to give meaning to the provision in the lease related to waiver[.]" Landlord requests that we "find as a

30

matter of law that the waiver of the option was not effective because it was not in writing and because it was inconsistent with the lease to find that the waiver was permanent and irrevocable."

The Charge was prepared by the court with input from the attorneys. Neither party objected to the final charge:

> THE COURT: The Court has a charge that the attorneys have worked on with the Court. Are there any objections or submissions from either side?
> COUNSEL FOR TENANT: No objections from plaintiffs' side.
> THE COURT: Okay.
> COUNSEL FOR LANDLORD: No objections, Your Honor.

The waiver issue was presented in Question 3:

> **Question No. 3**
> Did Dream Land and Alaa Hamdan waive the $40,000.00 payment specified in the 2013 lease to be made in January 2019 by Sanna Enterprises and Muhammad Malik?
>
> In connection with this question, the Court instructs you as follows:
> If compliance was waived by Dream Land and Alaa Hamdan, failure, if any, of Sanna Enterprises and Muhammad Malik to make the $40,000.00 payment in January 2019 as specified in the 2013 lease is excused.
> Waiver is an intentional surrender of a known right or intentional conduct inconsistent with claiming the right. A party's express renunciation of a known right can establish waiver. Silence or inaction for a long period of time can show an intent to yield a known right and constitute waiver.
> Answer "yes" or "no".
> Answer: Yes

Since Appellant did not object to the law as submitted by the court in the charge to the jury, a complaint about the submission of the law to the jury has been waived. "Failure to submit a definition or instruction shall not be deemed a ground for reversal of the judgment unless a substantially correct definition or instruction has been requested in writing and tendered by the party complaining of the judgment." *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 43 (Tex. 2007) (citing *State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex. 1992); Tex. R. Civ. P. 278.

In the absence of an objection, the sufficiency of the evidence is measured against the statement of law contained in the charge, even if it is defective. *See, e.g.*, *Romero v. KPH Consol., Inc.*, 166 S.W.3d 212, 221 (Tex. 2005); *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 715 (Tex. 2001) (stating that an assessment of the evidence "must be made in light of the jury charge that the district court gave without objection[]"). We interpret Appellant's third issue to be a challenge to the sufficiency of the evidence on the issue of waiver of the requirement that Tenant pay a $40,000 renewal fee.

When analyzing a challenge to the legal sufficiency of the evidence supporting a jury's verdict, we view the evidence in the light most favorable to the prevailing party, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *See City of Keller*

32

*v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005). Since Tenant prevailed at trial on this issue, we view the evidence in the light most favorable to its claims. *See id.* The evidence is legally sufficient if it enables "reasonable and fair-minded people to reach the verdict under review." *Id.* at 827. In determining the factual sufficiency of the evidence, courts of appeals must weigh all the evidence, both for and against the finding. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001). In reviewing a factual sufficiency challenge to a finding for which the appellee had the burden of proof, we "set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (citations omitted); *Royce Homes, L.P. v. Humphrey*, 244 S.W.3d 570, 575 (Tex. App.—Beaumont 2008, pet. denied).

The jury found that Hamdan signed the Lease Amending Agreement which states that clauses three and four of the 2013 lease "are amended to efface[.]" Clause four in the 2013 lease states the lease will terminate early if Tenant fails to pay Landlord a one-time payment of $40,000. Tenant admittedly did not pay that sum, and under the 2013 lease the lease terminated unless Landlord waived payment, or the parties amended the lease to remove the payment requirement. The parties submitted the waiver of the option fee issue to the jury in question three. Appellant did not challenge the charge given to the jury on this issue.

After viewing the evidence in the light most favorable to the prevailing party on jury issue three, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not, we conclude that that a reasonable and fair-minded jury could have found that the $40,000 payment was waived by the Landlord, and the evidence is legally sufficient. We also conclude after examining the entire record, that the jury's finding is factually sufficient and the jury's finding in question three is neither contrary to the overwhelming weight of the evidence, nor is it clearly wrong and unjust.

We overrule Landlord's third and final issue.

## CONCLUSION

Having overruled all of Landlord's appellate issues, we affirm the trial court's judgment.

AFFIRMED.

JAY WRIGHT
Justice

Submitted on November 19, 2025
Opinion Delivered February 19, 2026

Before Golemon, C.J., Johnson and Wright, JJ.